[No. 34492. Department Two. May 1, 1958.]

THE STATE OF WASHINGTON, *on the Relation of C. Carl Sternoff et al., Plaintiff*, v. THE SUPERIOR COURT FOR KING COUNTY, *Raymond Royal, Judge, Respondent.*[1]

[1]Reported in 325 P. (2d) 300.

*Carlson, Newlands & Reha* and *Paul Sinnitt*, for relators.

*The Attorney General, Delbert W. Johnson* and *George H. Holt, Assistants*, for respondent.

DONWORTH, J.—This matter comes before the court pursuant to the issuance of a writ of certiorari to review condemnation proceedings had in the respondent court, which culminated in the entry of an order adjudicating that the proposed taking and damaging of certain land owned by relators in King county was for a public use and was necessary for state highway purposes.

An understanding of the legal problem involved requires a detailed description of the manner in which the state proposes to take and damage the relators' land in connection with construction of the new state highway.

The land sought to be condemned consists of 23.9 acres of flat lowland, quadrangular in shape. It is bounded on the north by the south city limits of Seattle, and on the east by Empire way (an existing state highway extending north and south). The south boundary is located approximately two hundred feet south of the south shoulder of an existing public highway, Boeing access road (hereinafter referred to as Boeing road), which extends in a generally east-west direction across the entire width of relators' land. On the west, an existing railroad right of way borders relators' land. The land is subject to an existing easement, two hundred feet in width, upon which Boeing road is maintained.

Because the land is bisected by Boeing road, two separate, approximately rectangular, tracts are formed, the northerly tract being the larger. Both tracts had unlimited access to Empire way and to Boeing road at the time this proceeding was commenced.

This entire acreage (consisting of the two separate parts just mentioned) was purchased by relators in March, 1954, for the purpose of future industrial development. At the time of the initial hearing of this matter (August, 1957) one of the relators estimated the value of the entire acreage at in excess of one-half million dollars.

On May 15, 1957, the director of highways filed a petition for an order declaring that this entire tract was necessary for the public use, namely, for "the construction, maintenance and operation of Primary State Highway No. 1, as a limited access highway." This highway, as proposed, will be a six-laned freeway having three northbound and three southbound lanes, divided by a median, and will be part of the Tacoma-Seattle-Everett freeway. Traffic will be channelized, and access to and from the freeway will be wholly controlled. The proposed freeway will cross both of relators' tracts in a generally northwesterly-southeasterly direction, bisecting each of them. Hence, relators' land will be quartered by the intersection formed by the crossing of Boeing road over the proposed freeway.

In order to facilitate the movement of traffic from the freeway to the nearby Empire way and Boeing road (and from these highways to the freeway) and yet maintain fully controlled access to and from the freeway, a series of ramps and interchanges, together with additional acceleration and deceleration lanes (to and from these ramps and interchanges), will be constructed, partially upon the land now owned by relators and partially upon adjoining lands. The proposed design of these facilities entirely eliminates left turns on to, or off of, the freeway.

The following diagram serves to illustrate the construction in the general vicinity as proposed in the plan approved by the director of highways on July 16, 1957, and particularly that portion which affects the land which is the subject of this action. That land, as above described, is enclosed within heavy lines. The broken lines extending generally east and west across the enclosure represent the easement for Boeing road to which the property was subject prior to the commencement of this action. The small hatch marks toward the outer limits of the diagram indicate the area in which access is to be limited. The diagram does not show the eastern boundary of the limited access area north of the Boeing road. For convenience in identification, the ramps entering and leaving the freeway are numbered counter-

clockwise. Likewise, the areas affected by these ramps are lettered similarly.

This matter was first heard in the trial court in August, 1957, at which time it was disclosed that the highway commission had, on May 4, 1956, caused a map, dated and approved April 17, 1956, to be recorded by the King county

auditor pursuant to the provisions of RCW 47.28.025. Under the provisions of RCW 47.28.026, the practical effect of filing the map was to prevent the owners from developing the

property during the ensuing year, because, if the land were condemned, they would be unable to recoup disbursements made for improvements during that time.

The map approved April 17, 1956, contemplated entry of the freeway onto relators' property in the southwest corner of the northerly tract, crossing diagonally to the northeast from Boeing road. Actual construction upon relators' land under this plan would have been confined approximately to the area designated "B" on the above diagram. The eastern boundary of the limited access area paralleled the easterly margin of the freeway.

This plan made no provision for ramps connecting the freeway with Boeing road which would have affected relators' tract south thereof. Hence, under the plan proposed at that time, only about nine acres on the westerly side of relators' property north of Boeing road would have been required for highway purposes. Thus relators would have retained approximately fifteen acres of usable land.

On May 7, 1957, the director of highways approved a map superseding that of April 17, 1956. The later map proposed construction as indicated on the above diagram. However, the east boundary of the area in which access was planned to be limited north of Boeing road was established on the *west* side of the Empire way right of way.

Thereafter, on July 16, 1957 (during the pendency of this action), the plan from which the above diagram has been prepared was approved by the director of highways. This plan is substantially the same as that of May 7, 1957, except that the eastern boundary of the limited access area north of Boeing road is proposed to extend on the *easterly* side of Empire way. This limited access boundary will completely enclose a two-directional "T" (or "Trumpet") interchange which will be constructed east of Empire way, thereby connecting Empire way with the freeway, via the connecting highway just north of the city limits (as shown on the diagram). This revised plan was adopted by the highway commission by resolution on July 17, 1957. It was further pro-

vided in this resolution that abuttors' rights of access within the area be acquired.

At the conclusion of the initial hearing, the trial court refused to enter the order petitioned for. His reasons for so doing are set forth in a memorandum decision, which reads, in part:

"The evidence indicated that there was a lack of plans for the extension of the highway in either direction from the proposed interchange. Further, the evidence indicated a long period of indecision and vacillation on the part of the petitioner. Suddenly out of all this comes a conclusion by the petitioner that the respondents' property is needed for an interchange to connect a highway running north and south upon a right of way for which no planned location exists.

"This court is disposed to rule that the condemnation of a substantial piece of extremely valuable, scarce and important land for the purpose of building a highway interchange, without knowing that the proposed highway is planned to connect to the interchange, is not a public purpose. This would be true, even though the law is clearly established that condemnation for use as a public highway is a public use within the requirements of RCW Chapter 47.52.

"However, the decision indicated above, which the evidence compels, does not appeal to the common sense of this court. For many years the public press has carried many news items about a proposed freeway between Everett and Tacoma. The court finds it impossible to believe that the petitioner did not have an existing plan to connect the proposed interchange to the long-sought and overdue proposed Tacoma-Everett freeway.

"The court will entertain a motion by petitioner to reopen the case for the introduction of evidence on this point. If such a motion has not been served and filed within one week from the date of this memorandum, the court will entertain the presentation from respondents of appropriate documents dismissing this petition, all in accordance with applicable rules of court."

A second hearing was had in September, 1957, pursuant to the state's timely motion to reopen the case for the reception of additional evidence. At this hearing, the state introduced numerous maps defining the proposed course of the

freeway both north and south from relators' land. These exhibits show the contemplated route of the freeway and the locations of interchanges northward through Seattle, as well as the proposed general scheme of construction south of relators' land.

Alternate routes, depending upon the location of the Duwamish river crossing, approach relators' land from the south. For the purpose of this case, it will make no difference which of these routes is ultimately selected.

At the conclusion of the second hearing, the trial court rendered his oral decision in favor of the state. Thereafter, the order adjudicating public use, which is before us for review, was entered.

Relators contend that the trial court erred:

"1. In granting an Order Adjudicating Public Use authorizing the State to condemn 4.5 acres of land adjacent to the Boeing Access Road and Primary State Highway No. 2, Empire Way, and 2.5 acres adjacent to the Boeing Access Road and the railroad, which will not be used for highway construction.

"2. In permitting the State to limit access without an access hearing as required by RCW 47.52.072 through 47.52-.075.

"3. In failing to dismiss the State's petition."

Because these assignments of error are interrelated, they will be considered together.

Certain objections made by relators challenge the ability of the state to complete the contemplated highway. These matters relate to certain conditions which must be met before the state may qualify for apportioned Federal matching funds which will, in large measure, be used to finance construction. Relators fear that the highway presently proposed will not be constructed. But these matters are not germane to the issues before the court in determining the right of the condemnor to an order adjudicating public use and necessity.

RCW chapter 8.04 provides the manner in which the authority delegated by the legislature to the director of high-

ways for. the purpose of acquiring lands by condemnation may be exercised. More specifically, RCW 8.04.070 requires:

"At the time and place appointed for hearing the petition [as provided in RCW 8.04.010 and 8.04.020], . . . if the court has satisfactory proof that all parties interested in the lands, . . . described in the petition have been duly served with notice, and is further satisfied by competent proof that the contemplated use for which the lands, . . . sought to be appropriated is really necessary for the public use of the state, it shall make and enter an order, to be recorded in the minutes of the court, . . . adjudicating that the contemplated use for which the lands, . . . are sought to be appropriated is really a public use of the state."

■ Interpreting this statute in *State ex rel. Bremerton Bridge Co. v. Superior Court*, 194 Wash. 7, 76 P. (2d) 990 (1938), we said:

"Under . . . [RCW 8.20.070], three prerequisites to an adjudication of public use are recognized: (1) That the use is really a public use; (2) that the public interests require it; and (3) that the property appropriated is necessary for the purpose. [Citing cases.]"

See, also, *State v. Slater*, 51 Wn. (2d) 271, 317 P. (2d) 519 (1957), and *State v. Hatchard*, 49 Wn. (2d) 442, 302 P. (2d) 478 (1956).

The first of these prerequisites is made mandatory by Art. I, § 16, of the Washington state constitution, as amended (amendment 9), which declares, in part:

"Whenever an attempt is made to take private property for a use alleged to be public, the question whether the contemplated use be really public shall be a judicial question, and determined as such, without regard to any legislative assertion that the use is public: *Provided,* that the taking of private property by the state for land reclamation and settlement purposes is hereby declared to be for public use."

■ It must be conceded that the acquisition of private property for the purpose of constructing and maintaining a public highway thereon is a "public use" within the meaning of the constitution and RCW 8.20.070. *State ex rel. Bremerton Bridge Co. v. Superior Court, supra; State ex rel. McPherson Bros. Co. v. Superior Court,* 148 Wash. 203,

268 Pac. 603 (1928); *State ex rel. Flick v. Superior Court,* 144 Wash. 124, 257 Pac. 231 (1927)..

██ The second prerequisite above mentioned has been answered by the express declaration of our legislature in RCW 47.10.700 (Laws of 1957, chapter 189, § 1, p. 715), which reads:

"Increased traffic and increased costs of highway and bridge construction make necessary additional moneys with which to complete the sections of primary state highway No. 1 through and between the cities of Tacoma, Seattle, and Everett and as an additional alternate route by-passing Seattle east of Lake Washington. *It is vital to the economy of the state and the safety of the traffic that these sections shall be completed to relieve traffic congestions, to insure greater safety to highway users, and to assure an adequate through highway to accommodate traffic from bridges across Lake Washington as soon as possible.*" (Italics ours.)

However, long before the enactment of the present statute, our legislature recognized the inadequacy of existing highway facilities connecting the cities named therein. In 1953, the legislature first considered the construction of this improvement by enacting Laws of 1953, chapter 183, p. 393, which authorized the Washington toll bridge authority to study, and, if feasible, after approval of the state highway commission, to locate, construct, and finance an express highway from Tacoma through Seattle to Everett. The substantive provisions of that act, except for appropriations, were expressly repealed in the enactment of Laws of 1955, chapter 268, p. 1092 (RCW 47.59), which also provided for the construction of this facility as a toll road (until the costs of construction should be repaid). However, the later act was held unconstitutional in *Washington Toll Bridge Authority v. State,* 49 Wn. (2d) 520, 304 P. (2d) 676 (1956).

But prior to our decision in that case, the Congress of the United States enacted the Federal aid highway act of 1956 (P. L. 627, June 29, 1956; 70 Stat. 374 *et seq.;* 23 U. S. C. A., § 151 *et seq.*) By this act, the Federal government sought to accelerate construction of the "National System of Inter-

state and Defense Highways" in the interests of national defense and commerce. Federal matching funds, at an approximate ratio of nine Federal dollars per one state dollar, were made available to the several states, subject to certain conditions.

At its next session, the legislature, in order to enable the state to take advantage of this Federal aid program for the financing of this much needed highway facility, enacted Laws of 1957, chapter 189, p. 715 (RCW 47.10.700 through 47.10.724).

RCW 47.10.702 provides:

"This highway project shall be constructed as a part of the federal interstate highway system as a *fully controlled limited access facility and shall meet the standards and specifications required by the state of Washington and the Secretary of Commerce of the United States in order to qualify for federal grants in aid as provided for in the Federal-Aid Highway Act of 1956.* The state shall perform all conditions precedent to payment in advance of apportionment as provided by section 108(h) of the Federal-Aid Highway Act of 1956 so as to be entitled to federal aid funds for the project covered by RCW 47.10.700 through 47.10.724 when such funds are apportioned." (Italics ours.)

RCW 47.10.704 provides:

"In order to facilitate vehicular traffic through and between the cities of Tacoma, Seattle and Everett and to remove the present handicaps and hazards over and along primary state highway No. 1 as presently established [RCW 47.16.010], the state highway commission is authorized to realign, redesign and reconstruct primary state highway No. 1 upon a newly located right of way or upon portions of existing right of way through and between the cities of Tacoma, Seattle and Everett and as an additional alternate route by-passing Seattle east of Lake Washington. The route of the proposed project is established as follows: Beginning in the vicinity of Ponders Corner, thence in a general northeasterly and northerly direction through the cities of Tacoma and Seattle to a point in the vicinity of the city of Everett and as an additional alternate route by-passing Seattle east of Lake Washington."

RCW 47.28.010 reads, in part:

"Whenever the general route of a state highway is designated as running to or by way of certain designated points, without specifying the particular route to be followed, the director shall determine the most feasible route to be followed by the highway to or by way of the designated points, and may select and adopt as a part of the highway, the whole or any part of any existing public highway . . . *The director need not select and adopt the entire routes for the state highways at one time, but may select parts of the routes from time to time as he deems advisable.* When a state highway is designated as passing by way of a certain point, this shall not require the director to cause the highway to pass through or touch such point but such designation is directional only and may be complied with by location in the general vicinity." (Italics ours.)

Applying the foregoing statutes to the present case, we find that the legislature has declared the necessity of the proposed freeway (RCW 47.10.700), authorized its relocation and established its general route (RCW 47.10.704), and provided for financing the costs of the project (RCW 47.10.702). The director of highways has selected a specific route, at least with respect to that portion of the highway here involved (RCW 47.28.010), and has commenced this action as authorized by RCW 47.12.010, which provides, in part:

"The director on behalf of the state may acquire by . . . condemnation any property and property rights, including deposits of road materials and rights-of-way thereto, necessary for the construction, protection, and maintenance of state highways and for the safety and convenience of the public thereon. Condemnation actions shall be brought in the name of the state as provided for acquiring property for the public uses of the state [RCW 8.04.010 *et seq.*], and *in such actions selection of the property and property rights by the director is conclusive that they are necessary for the purposes sought, in the absence of bad faith, or arbitrary, capricious, or fraudulent action.*" (Italics ours.)

We are satisfied that, in order to effectuate the intention of the legislature, public interest requires the taking of whatever portion of relators' entire acreage is neces-

sary for the "construction, protection, and maintenance of" this state highway, as in RCW 47.12.010 provided. Hence, the ultimate question to be resolved concerns the third prerequisite aforementioned, *viz.*, whether the property proposed to be appropriated is necessary for that purpose.

Relators argue that the taking of their entire acreage is constructively arbitrary and capricious because the evidence shows that the whole tract is not necessary for actual highway construction. In support of their position, relators cite *State v. Superior Court,* 128 Wash. 79, 222 Pac. 208 (1924). We there held that, under the peculiar circumstances of that case (which differ substantially and materially from the facts now before us), the conduct of the highway authorities in selecting a proposed route was *constructively* arbitrary, although no *actual* bad faith or arbitrary, capricious, or fraudulent conduct was shown to exist. We said:

"The legislature by Laws of 1921, ch. 32, p. 116 (§ 6766, Rem. Comp. Stat.) [P. C. § 6786], has established the law relative to this situation, where this appears:

" ' . . . and in such action the selection of the lands by the supervisor of highways shall, in the absence of bad faith, arbitrary, capricious or fraudulent action, be conclusive upon the court and judge before which the action is brought that said lands are necessary for the purpose sought.' [Compare the italicized portion of RCW 47.12.010, above quoted.]

"Prior to the passage of this act, this court had in effect said as much in *State v. Superior Court,* 111 Wash. 542, 191 Pac. 413, and *State ex rel. Urquhart v. Superior Court,* 112 Wash. 34, 191 Pac. 416, and, after the passage of the act, in *State ex rel. Hanson v. Superior Court,* 117 Wash. 399, 201 Pac. 1, affirmed the law, and there is nothing in the statute or decisions from which the court at this time has any inclination to depart."

Nor have we since departed from the rule there announced. See *State ex rel. Bremerton Bridge Co. v. Superior Court, supra,* and cases cited therein.

■ Referring now to the above diagram, and particularly to that part of relators' property lying south of the Boeing road, we are satisfied that the testimony contained

in the record justifies the taking of tracts "D," "E," "F," and the small tract lying northeast of tract "F" (enclosed by "on-ramp" No. 4, Boeing road and Empire way) for actual construction and maintenance purposes. The director of highways has not acted arbitrarily, capriciously, or fraudulently in seeking to acquire these parcels of land for the state.

■ Of course, the land within reasonable right of way margins, upon which the proposed freeway and its many ramps are to be actually constructed, is "really necessary for the public use of the state." (RCW 8.04.070.) Likewise, because tract "C" will be almost completely surrounded by new construction, including the structural overcrossing on Boeing road, we are unable to say that the taking thereof is arbitrary or capricious so as to establish constructive fraud.

■ Tracts "A" and "B" present a different problem. The state's evidence revealed, and the diagram clearly shows, that these tracts are not necessary for actual highway construction or maintenance. Although there is testimony that the highway department intends to landscape tract "B," thereby beautifying the area, our attention has not been called to any statute which authorizes the director of highways to condemn private property for that purpose. We think that a fair summary of the evidence shows that, while not being actually necessary for construction and maintenance purposes, these tracts are necessary in order to establish the wholly limited access facility contemplated in the above diagram. Having affirmatively shown that tracts "A" and "B" are not actually necessary for the purposes mentioned in RCW 47.12.010, the third prerequisite announced in *State ex rel. Bremerton Bridge Co. v. Superior Court, supra,* has not been satisfied. Consequently, these tracts (not being necessary) cannot be taken for the purposes authorized by that statute.

However, as previously stated, the state alleged in its petition that relators' entire acreage was necessary for "the construction, maintenance and operation of Primary State

Highway No. 1, *as a limited access highway.*" Our inquiry, then, is whether or not tracts "A" and/or "B" may be condemned by the state for the purpose of establishing a limited access facility.

In RCW 47.52.001, the legislature has declared the policy of this state with respect to limited access facilities as follows:

"Unrestricted access to and from public highways has resulted in congestion and peril for the traveler. It has caused undue slowing of all traffic in many areas. The investment of the public in highway facilities has been impaired and highway facilities costing vast sums of money will have to be relocated and reconstructed. It is the declared policy of this state to limit access to the highway facilities of this state in the interest of highway safety and for the preservation of the investment of the public in such facilities."

It cannot, therefore, be asserted that a taking or damaging of private property for this purpose is not for a "public use." See *State ex rel. Eastvold v. Superior Court,* 47 Wn. (2d) 335, 287 P. (2d) 494 (1955).

RCW 47.52.020 provides, in part:

"The highway authorities of the state . . . may plan, designate, establish, regulate, vacate, alter, improve, construct, maintain, and provide limited access facilities for public use wherever such . . . authorities are of the opinion that traffic conditions, present or future, will justify such special facilities."

By RCW 47.52.050, the legislature has provided for the acquisition of property for these facilities, in part, as follows:

"For the purpose of this chapter the highway authorities of the state . . . may acquire private or public property and property rights for limited access facilities and service roads, including rights of access, air, view, and light, by gift, devise, purchase, or condemnation, *in the same manner as such authorities are now or hereafter may be authorized by law to acquire property or property rights in connection with highways* . . . In the acquisition of property or property rights for any limited access facility or portion thereof, or for any service road in connection

therewith, the state . . . may, in its discretion, acquire an entire lot, block, or tract of land, if by so doing the interest of the public will be best served, even though said entire lot, block, or tract is not immediately needed for the limited access facility." (Italics ours.)

■ "It is well established that the owner of land abutting upon a conventional highway has an easement of ingress and egress." *State v. Calkins,* 50 Wn. (2d) 716, 314 P. (2d) 449 (1957). By the enactment of RCW 47.52.080, the legislature has sought to protect owners of property abutting upon existing highways by providing:

"No existing public highway, road or street shall be constructed as a limited access facility except upon the waiver, purchase, or condemnation of the abutting owner's right of access thereto *as herein provided.*" (Italics ours.)

RCW 47.52.072 provides, in part:

"No existing highway, road or street, or portion of an existing highway, road or street may be established as a limited access facility until the owners or reputed owners of the abutting property of the section affected, as indicated in the tax rolls of the county be given notice of such proposal and an opportunity to be heard thereon."

"Existing highway" is defined by RCW 47.52.011 as follows:

"For the purposes of this chapter, the term 'existing highway' shall include all highways, roads and streets duly established, constructed, and in use. It shall not include new highways, roads or streets, or relocated highways, roads or streets, or portions of existing highways, roads or streets which are relocated."

■ We are in accord with the principle expressed in *State ex rel. Postal Telegraph-Cable Co. v. Superior Court,* 64 Wash. 189, 116 Pac. 855 (1911), cited by relators, that:

"Statutes of eminent domain being in derogation of the common right must be strictly construed, both as to the extent of the power and as to the manner of its exercise."

See *State ex rel. Mower v. Superior Court,* 43 Wn. (2d) 123, 260 P. (2d) 355 (1953).

■ Referring again to the diagram, and particularly to tract "B," we find that "off-ramp" No. 2, which is to be

newly constructed, will separate this tract from Boeing road. Since this "off-ramp" is to be newly constructed, relators cannot claim an easement of access to it, because an easement has never in fact existed. *State v. Calkins, supra.* And since, after the construction of off-ramp No. 2, tract "B" will not abut upon an existing highway as defined in RCW 47.52.011, there exists no bar to the acquisition of this tract under the provisions of RCW 47.52.050.

 Tract "A," however, before and after construction, will abut upon Empire way and Boeing road, both existing public highways, which are neither new nor relocated, nor is there evidence to show that either of them is a portion of a relocated highway within the purview of RCW 47.52.011.

Strictly construed, RCW 47.52.050, which empowers the highway authorities to condemn property for limited-access facilities, is subject to the statutory conditions contained in RCW 47.52.080 and 47.52.072. For that reason, we must conclude that tract "A" cannot be taken by the state highway authorities for the purpose of establishing a limited-access facility without first following the statutory procedure detailed by the legislature in RCW 47.52.072 through RCW 47.52.075.

Concerning the contention of relators (raised for the first time in their reply brief) that they are entitled to damages occasioned as a result of the holding of this property in abeyance, pursuant to the provisions of RCW 47.28.025 and 47.28.026, we express no opinion.

Our conclusion is that the order before us for review must be affirmed as to all of relators' property except that portion designated as tract "A" on the above diagram. As to that portion, the state shall, within sixty days from the going down of the remittitur, file in the superior court its election, in writing, to proceed *either* (a) to comply with the provisions of RCW 47.52.072 *et seq.*, in order to acquire limited access rights with respect to Empire way and Boeing road, *or* (b) to file an amended petition designating an easterly boundary for the proposed right of way for state primary highway No. 1 across tract "A."

In the latter event, the cause is remanded to the trial court for the taking of evidence as to the reasonableness of the part of tract "A" then proposed to be taken for highway purposes, and for the entry of an order adjudicating public use and necessity based on such evidence and consistent with the views expressed in this opinion.

In all other respects, the order before us for review is hereby affirmed. Relators shall recover their costs in this court.

It is so ordered.

HILL, C. J., WEAVER, ROSELLINI, and FOSTER, JJ., concur.

