[No. 37677.   Department Two.   July 8, 1965.]

THE STATE OF WASHINGTON, *Petitioner*, v. ROY A. DAWES
*et al., Respondents.**

*The Attorney General, Delbert W. Johnson* and *Theodore
O. Torve, Assistants*, for petitioner.

*Eisenhower & Carlson* and *Paul Sinnitt*, for respondents.

WEAVER, J.—This is a sequel to the case of *State ex rel.
Dawes v. State Highway Comm'n*, 63 Wn.2d 34, 385 P.2d
376 (1963), in which we found that, as a condition prece-
dent to the maintenance of an action of eminent domain,
the Highway Commission had afforded respondent Dawes,
as an abutting property owner, a hearing pursuant to RCW
47.52.072-075.

*Reported in 404 P.2d 20.

By writ of certiorari, the state now seeks a review of an order adjudicating public use in the action of eminent domain. The order grants in part the property and property rights sought by the state as described in the petition and notice in condemnation, but denies an adjudication of public use for a portion of respondents' property.

The following sketch, prepared by the court from various exhibits, is for illustrative purposes only. Engineering accuracy is not claimed.

We expand the facts set forth in our prior opinion.

Linden Drive in the city of Sumner extends north and south. (Generally, it extends northeasterly-southwesterly, but for ease of reference we assume the north-south description.) It is the present route of Primary State Highway No. 5. The Washington State Highway Commission, deeming it necessary to relocate P.S.H. No. 5, instructed the Director of Highways to prepare a plan for the establishment of a limited-access highway. The plans as proposed establish a freeway extending east to west and passing under Linden Drive at substantially right angles to it. Linden Drive will be elevated approximately ten feet above its present level.

Respondents are the owners of 1.95 acres of valuable income property located, for the most part, in the northwest quadrant formed by the overpass intersection of Linden Drive and the proposed freeway. The property is identified on the sketch by the double line. The east side of the property abuts Linden Drive for about 225 feet. It is important to note that the north boundary of the property abuts Le Grange Street, which extends to an intersection with Hunts Avenue, Thompson Street and Linden Drive.

In general the state's plan calls for the construction of a "partial cloverleaf" interchange having two western quadrants as illustrated by the "EL" and "ER" loops on the chart. As proposed, "EL" would leave the freeway, pass under Linden Drive, curve north, cross Le Grange Street, curve southeast, cross the northeast corner of respondents' property, and lead into Linden Drive on a tangent. Thus, west bound traffic would leave the freeway on the "EL" off-ramp, traverse the loop, make a "free right turn" and proceed south on Linden Drive. In addition to the necessary right of way, the state seeks to condemn all of respondents' property encompassed by the "EL" off-ramp loop and Linden Drive. The area within the confine of the interchange would be leveled, graded and seeded.

Shorn of legal descriptions and technicalities, the order adjudicating public use permits the state to condemn that portion of the Dawes property necessary to construct P.S.H.

No. 5 as a limited-access highway and that portion lying within the "ER" loop. The court further found:

> that there is no legitimate reason and it is not necessary to take the . . . [Dawes] property within the loop formed by the EL line and the DL line. . . . A connection can be made with Le Grange Street [from P.S.H No. 5] allowing traffic to go to the intersection that exists between Hunt[s] and Thompson and to proceed in the same manner as traffic now proceeds in that area without the necessity of any continuous loop in the area of the property owned by . . . [Dawes]. The court further finds that a taking of any property that might be needed of the . . . [Dawes] to get to a point where it could properly connect with Le Grange and thence into Hunt[s] and Thompson Avenues would be proper, but not beyond that point nor any right to limit or restrict access to Le Grange Street or Linden Drive.

In short, the trial court "re-engineered" the northwest quadrant of the partial cloverleaf by (1) eliminating that portion of the "EL" loop north of Le Grange Street; (2) holding that state acquisition of the property within the "EL" loop was not for a public purpose; and (3) permitting access from the abutting property to both Le Grange Street and Linden Drive, thereby destroying the very characteristics of a limited-access highway.

A plethora of statute and decisional law has been made applicable to roads and highways since the day they were simply an opening through the forests, Conestoga wagon tracks across the plains, or a trail over a mountain pass. During the past two decades or so, in a constant search to improve the method of transporting persons and goods safely by motor vehicles, a new dimension has been added— freeways, limited-access highways, overhead crossings, ramps, acceleration and deceleration lanes, partial cloverleafs, cloverleafs, split-level interchanges, and a multitude of new engineering and constructional concepts.

This development has raised many novel questions of conflicts of theory between the planners of limited-access highways and owners of abutting properties. One legal writer expressed it thus:

Reconciliation of public highway use and private land use must be achieved within the constitutional limitations which define the public's power to appropriate or regulate private property for the benefit of the public welfare. These constitutional concepts are as abstract as the concept of the highway itself. Not surprisingly, therefore, this doctrine of reconciliation is in perpetual evolution. Netherton, Control of Highway Access at 10 (University of Wisconsin Press 1963).

The first law authorizing limited-access facilities in this state was enacted in 1947. Rem. Rev. Stat. (1947 Supp.) §§ 6402-60 to 6402-70. When the statute was amended in 1951 the legislature made the following declaration of policy:

Unrestricted access to and from public highways has resulted in congestion and peril for the traveler. It has caused undue slowing of all traffic in many areas. The investment of the public in highway facilities has been impaired and highway facilities costing vast sums of money will have to be relocated and reconstructed. *It is the declared policy of this state to limit access to the highway facilities of this state in the interest of highway safety and for the preservation of the investment of the public in such facilities.* RCW 47.52.001. (Italics ours.)

Designing a freeway and its interchanges is a matter of engineering judgment. In the instant case the highway department district location engineer testified:

In evolving a limited-access plan of any kind you approach the problem by developing the access control lines on the outer edges of the highway so you envelop the highway to isolate it from the abutting use and purchase the access rights in that manner. In a case of an interchange the procedure is to carry the access lines on the outer edges of the ramps which would be the outer ramps [enclosed within "DL," "DR" and Linden Drive on the sketch *supra*] . . . and develop the interchange area which is a very, very critical part of highway design because these are the places the traffic comes on and off and serves the highway, and *the highway is just as good as the access points. A breakdown at the access means the highway does not operate as well as it could.* (Italics ours.)

It is apparent that if respondents are permitted to retain access to Le Grange Street and Linden Drive, the free flow of traffic through the interchange will be affected.

Article 1, § 16 (amendment 9) of the constitution provides:

Whenever an attempt is made to take private property for a use alleged to be public, the question whether the contemplated use be really public shall be a judicial question, and determined as such, without regard to any legislative assertion that the use is public . . . .

In *State ex rel. Bremerton Bridge Co. v. Superior Court,* 194 Wash. 7, 19, 76 P.2d 990 (1938), the court said:

The necessity of taking land and [sic] public use decided by public administrative authorities empowered so to act, is binding on the courts in the absence of some showing of actual fraud on the part of such authorities or such arbitrary and capricious conduct as would amount to constructive fraud. [Citing authorities.]

Recently the court said in *State ex rel. Lange v. Superior Court,* 61 Wn.2d 153, 157, 377 P.2d 425 (1963):

Although the issue of public use and necessity is, under our constitution, a judicial one, we have long adhered to the theory that administrative selection is conclusive, in the absence of bad faith, arbitrary, capricious or fraudulent action. *State ex rel. Sternoff v. Superior Court, supra.* [52 Wn.2d 282, 325 P.2d 300 (1958)].

On numerous occasions, when considering the first phase of an action of eminent domain—the issuance of an order adjudicating public use—we have pointed out that the decision pivots on three interrelated findings: (1) That the proposed use is really a public use; (2) that the public interests require it; and (3) that the property appropriated is necessary for the proposed public purpose. *State ex rel. Lange v. Superior Court, supra; State ex rel. Sternoff v. Superior Court,* 52 Wn.2d 282, 325 P.2d 300 (1958); *State ex rel. Bremerton Bridge Co. v. Superior Court, supra.*

It is beyond dispute that the use of land for highway purposes is a public one and that public interest requires

the construction, operation and maintenance of highways. *State ex rel. Sternoff v. Superior Court, supra.*

The crux of this review is whether the property sought to be appropriated is necessary for the proposed public use.

We are aware that freeway interchanges are obviously prime locations for commercial and industrial use, as well as for residential development. Thus, if the non-access area is carried beyond the point necessary to assure that traffic will move in and out of the interchange in a safe and orderly manner, then it cannot be said that the area is needed for a public use. Maximum access to the interchange compatible with *safety* and efficient design should always exist.

█  Although some states exercise no control of traffic beyond the edge of the freeway right of way (See Netherton, Control of Highway Access at 286), we believe that a cloverleaf, *if designed within reasonable limits,* is an integral part of the limited-access highway and must be so in order to insure that the traffic pattern will be free-flowing through the interchange area. Of this, the state engineer testified:

> It has never been a possibility that a property could remain within an interchange loop and not destroy the workability of that interchange.

"Necessary," has been defined in statutory condemnation determination as reasonable necessity in the circumstances of the particular case. *State ex rel. Lange v. Superior Court, supra,* and cases cited. We recognize that there is a conflict between the expert testimony produced by the state and by the respondents; but we cannot say that the record supports the conclusion that the administrative and engineering determinations of the highway commission were made in bad faith, or were arbitrary and capricious. See *State ex rel. Dawes v. State Highway Comm'n,* 63 Wn.2d  34, 385 P.2d 376 (1963). We conclude, therefore, that the property sought by the state is necessary for the proposed public purpose.

The case is remanded with instructions to modify the

order adjudicating public use in accordance with this opinion.

It is so ordered.

DONWORTH, FINLEY, and OTT, JJ., and SHORETT, J. Pro Tem., concur.

September 22, 1965. Petition for rehearing denied.