128 P.3d 588 (2006)
CENTRAL PUGET SOUND REGIONAL TRANSIT AUTHORITY, a regional transit authority, d/b/a Sound Transit, Respondent,
v.
Kenneth R. MILLER and Barbara I. Miller, husband and wife, and Miller Building Enterprises, Inc., a Washington corporation, Appellants,
Northwest Community Bank, Designated Trustee Services, Inc., Bertram P. Weinman and Myra Weinman, Trustees of the Weinman Family Trust, Alan J. Wrye and Pansy D. Wrye, Vivian Bartlett, and All Unknown Owners and All Unknown Tenants, Defendants,
Pierce County, a municipal corporation, Respondent.
No. 76284-8.
Supreme Court of Washington, En Banc.
Argued May 26, 2005.
Decided February 16, 2006.
*591 Charles A. Klinge, Diana M. Kirchheim, Groen Stephens & Klinge LLP, Bellevue, for Petitioner/Appellant.
Larry John Smith, Janis G White, Graham & Dunn PC, Seattle, David H. Prather, Pierce County Deputy Prosecutor, Civil Division, Tacoma, for Appellee/Respondent.
Timothy Ford, Olympia, for Amicus Curiae, Building Industry Assoc. of Washington.
FAIRHURST, J.
¶ 1 Kenneth R. Miller and Barbara I. Miller and Miller Building Enterprises, Inc., a construction company (hereinafter collectively Miller), own a large parcel of land in Tacoma near a railroad line. Central Puget Sound Regional Transit Authority, commonly known as Sound Transit, seeks to condemn this property to build a park-and-ride for a commuter rail transit station. To do so, Sound Transit must establish, among other things, that the condemnation is necessary. Whether condemnation is necessary is a legislative judgment. Courts will overturn that legislative judgment only when the challenger can prove that it is the product of actual fraud, or is arbitrary and capricious enough to constitute constructive fraud, or when the government fails to abide by the clear dictates of the law.
¶ 2 After extensive research and solicitation of community opinion, several potential sites were identified. Sound Transit held a public hearing to determine which proposed site to use for the rail station. By law, potential condemnees are not entitled to actual individualized notice. Instead, Washington law requires that agencies develop procedures to give reasonable notice of these meetings to the public which may include informing the local media. Sound Transit has elected to implement this statutory discretion by posting meeting times and agendas on its website. It does not directly notify the media.
¶ 3 The primary issue for review is whether Sound Transit's method of notifying the public of its meetings is adequate. Alternately, Miller challenges the substantive decision that public necessity for the condemnation exists. We hold that Sound Transit complied with statutory requirements in notifying the public of its meetings and that Sound Transit's determination of necessity is not the product of actual or constructive fraud. We affirm the trial court.

I. FACTS
¶ 4 In 1992, in an effort to respond to the increasing traffic congestion in the Puget Sound region, the Washington Legislature authorized the state's largest counties to seek voter approval to create regional transportation entities to coordinate efforts to create and maintain a healthy transportation infrastructure. RCW 81.112.010. These transit authorities were given all powers necessary to implement and support a high capacity transportation system, including the power to condemn private property. RCW 81.112.070, .080(2). Four years later, voters in the Puget Sound region approved the creation and funding of Sound Transit. Among its other projects, Sound Transit is attempting to make commuter rail an alternative to commuters along the I-5 corridor.
¶ 5 Currently, commuter rail runs from downtown Tacoma to downtown Seattle. This case involves Sound Transit's efforts to extend the line south. In 1998, Sound Transit began to investigate possible sites for a new transit station in South Tacoma or Lakewood. In 1999, workshops and public meetings were held in Tacoma to determine the best way to proceed and the best potential sites for transit stations. By 2001, three different possible sites had been identified. One of the sites near South Tacoma Way and south 60th in Tacoma involved a large piece of property owned by Miller. The Miller property would be able to provide about 85 percent of the space needed for a park and ride. While the site is apparently contaminated with industrial waste, it appears that it can safely be used as a parking lot.
¶ 6 In the first three years of the site investigation, Miller cooperated with Sound Transit in the possible condemnation action. In 2001, Miller executed a release that allowed Sound Transit to enter the property to survey and take soil samples. Meanwhile, in June 2003, Sound Transit scheduled a public *592 Board of Directors meeting to discuss which of three sites in the area was best suited for the transit center. Notice of this meeting and its agenda were published on the Sound Transit web site but it appears that no other steps were taken to inform the community of the upcoming meeting. A Sound Transit employee testified that it was considered "unseemly" to notify property owners individually that a state agency is considering condemning their property before a decision had been made. 1 Verbatim Report of Proceedings (VRP) (Oct. 25, 2004) at 31. Sound Transit's internal rules recite that:
Whenever feasible, the Board Administrator shall furnish the Agenda for meetings of the Board and Committees to one or more local newspapers of general circulation in advance of such meetings.
Ex. 14, at 12. According to Marcia Walker, the administrator to the Board of Sound Transit, "[t]he way that [Sound Transit] furnish[es] the agenda and materials to the public and media is by posting on the website." 1 VRP at 101. Walker testified that this method had been used to provide notice ever since Sound Transit had a web site. The trial court specifically found that the method satisfied both statutory requirements and Sound Transit's internal rules.
¶ 7 At the public Board of Directors' meeting, the plan that included the Miller property (along with others) was selected. The record indicates this was motivated in part by the fact that no overpass would have to be built over the railroad tracks and all parking could be consolidated in one lot, which would be simpler to control and secure. Sound Transit then instituted condemnation proceedings against all of the selected properties. On July 10, 2003, Miller was served with a formal notice of intent to acquire property. In August 2004, Miller was served with the petition in eminent domain. The public use and necessity hearing was held on October 25 and November 1, 2005, in Pierce County Superior Court.
¶ 8 At the public use and necessity hearing, Miller resisted the condemnation and challenged the Board of Directors' determination that the condemnation of their property was necessary. Miller argued that the agency had improperly rejected other sites on the erroneous belief that they were environmentally contaminated and had overlooked the value of a building on their property which has the apparent distinction of being the first house built along a railroad right-of-way in Tacoma. The trial court concluded that Sound Transit had given proper notice, had established public use and necessity, and that the condemnation action could proceed to the just compensation stage. The trial court explicitly rejected Miller's claim that the action was arbitrary and capricious or the product of fraud. Miller sought direct review, which we granted.[1]

II. ISSUES

A. Did Sound Transit adequately notify the community of the meeting agenda where the necessity for condemning the property would be discussed?

B. Did Miller establish that Sound Transit committed actual or constructive fraud in determining that there was public necessity for condemning the Miller property?

III. ANALYSIS
¶ 9 We first briefly review the underlying law. The power of eminent domain is an inherent attribute of sovereignty. Boom Co. v. Patterson, 98 U.S. (8 Otto) 403, 406, 25 L.Ed. 206 (1878); see also State v. King County, 74 Wash.2d 673, 675, 446 P.2d 193 (1968) (citing Miller v. City of Tacoma, 61 Wash.2d 374, 378 P.2d 464 (1963)). That power is limited by the constitution and must be exercised under lawful procedures. Miller, 61 Wash.2d at 382-83, 378 P.2d 464; King County, 74 Wash.2d at 675, 446 P.2d 193. Once a state agency with the power of eminent domain has made the initial determination that condemnation is necessary, the matter moves into court for a three-stage proceeding. First, there must be a decree of public use and necessity. Second, just compensation *593 must be determined. Finally, just compensation must be paid and title transferred. See generally 17 WILLIAM B. STOEBUCK & JOHN W. WEAVER, WASHINGTON PRACTICE, REAL ESTATE: PROPERTY LAW (2d ed.2004) § 9.28, at 635 (hereinafter STOEBUCK & WEAVER); City of Des Moines v. Hemenway, 73 Wash.2d 130, 138, 437 P.2d 171 (1968); see also WASH. CONST. art. I, § 16. We are only at the first stage of this proceeding and Miller conceded at the hearing below that this property is being condemned for a public use.[2] Miller challenges whether condemnation is necessary.
¶ 10 Whether condemnation is necessary is largely a question for the legislative body of the jurisdiction or government agency seeking condemnation. Hemenway, 73 Wash.2d at 139, 437 P.2d 171. A legislative body's declaration of necessity "is conclusive in the absence of proof of actual fraud or such arbitrary and capricious conduct as would constitute constructive fraud." Id. at 139, 437 P.2d 171 (citing City of Tacoma v. Welcker, 65 Wash.2d 677, 399 P.2d 330 (1965)). In the condemnation context, necessary means "reasonable necessity under the circumstances. State ex rel. Lange v. Superior Court, 61 Wash.2d 153, 377 P.2d 425 (1963). It does not mean immediate, absolute, or indispensable need." Id. at 140, 437 P.2d 171.
¶ 11 Typically, challenges to necessity are raised when arguably excess land is seized or when condemnation is for a disguised private use. See, e.g., State ex rel. Wash. State Convention & Trade Ctr. v. Evans, 136 Wash.2d 811, 966 P.2d 1252 (1998) (holding condemnation of property needed for convention center expansion lawful even though an incidental private use would ensue). Out of respect for our coordinate branches of government, judicial review is deferential. E.g., id., at 823, 966 P.2d 1252. Additionally,
[w]hen it comes to such discretionary details as the particular land chosen, the amount of land needed, or the kinds of legal interests in that land that are necessary for the project, many Washington decisions have said that the condemnor's judgment on these matters will be overturned only if there is "proof of actual fraud or such arbitrary and capricious conduct as would amount to constructive fraud."
STOEBUCK & WEAVER, at 636 (quoting State v. Brannan, 85 Wash.2d 64, 68, 530 P.2d 322 (1975). "Seldom has this court found that a condemning authority has abused its trust in making a declaration of public necessity. This should not be surprising, for it is not to be presumed that such abuses often occur." Brannan, 85 Wash.2d at 68, 530 P.2d 322.
¶ 12 Washington courts have held that personal notice of the public meeting establishing necessity is not required either by the statute or due process. Port of Edmonds v. NW. Fur Breeders Coop., Inc., 63 Wash.App. 159, 168, 816 P.2d 1268 (1991). Personal notice is required, however, to begin *594 the three-step condemnation proceeding. Id. ("[P]ersonal notice (and hearing) are required before a final taking of a property can occur."). Miller does not contend that they did not receive personal notice of the condemnation proceeding.

A. Notice Adequacy
¶ 13 Miller challenges the notice Sound Transit provided for the public hearing at which the site selection was made. Miller asserts that the notice was inadequate and, therefore, argues that this court should vacate the legislative declaration that condemnation is necessary.

1. General requirements
¶ 14 Procedural errors, such as lack of proper notice, are questions of law reviewed de novo. State v. Harris, 114 Wash.2d 419, 441, 789 P.2d 60 (1990). As the challenger, Miller bears the burden of proof that the notice was defective. The trial judge found that the notice met the statutory and internal requirements and rejected the claim below. Clerk's Papers (CP) at 252 ("There were no deficiencies in notice, and Sound Transit did hear from the appropriate participants when indicated.").
¶ 15 Importantly, Miller never convincingly argues that they had no notice of this hearing. Nor does Miller raise a facial due process challenge. There is considerable evidence that Miller was involved in the site selection process for many years. Instead, Miller is essentially raising a general claim that the public had insufficient notice.
¶ 16 Sound Transit is obligated to give notice of public meetings where eminent domain will be discussed. RCW 81.112.080(2) (directing regional transportation entities to use the same methodology as first class cities for such procedures); RCW 35.22.288 (setting forth procedures). Specifically:
[E]very city shall establish a procedure for notifying the public of upcoming hearings and the preliminary agenda for the forth-coming council meeting. Such procedure may include, but not be limited to, written notification to the city's official newspaper, publication of a notice in the official newspaper, posting of upcoming council meeting agendas, or such other processes as the city determines will satisfy the intent of this requirement.

RCW 35.22.288 (emphasis added). Sound Transit determined that posting meeting agendas on its own web site satisfied the intent of the statute and furnished appropriate notice to the community.[3]
"¶ 17 The purpose of notice statutes is to apprise fairly and sufficiently those who may be affected of the nature and character of an action so they may intelligently prepare for the hearing." Nisqually Delta Ass'n v. City of DuPont, 103 Wash.2d 720, 727, 696 P.2d 1222 (1985). Courts have vacated a legislative decision that condemnation is necessary for violation of notice statutes. See NW. Fur Breeders, 63 Wash.App. at 169, 816 P.2d 1268.
¶ 18 In Northwest Fur Breeders, the local port authority sought to condemn property near a harbor. NW. Fur Breeders, 63 Wash. App. at 161, 816 P.2d 1268. Port districts, like regional transportation districts, are directed by statute to use the same eminent domain procedures as first class cities. Id. at 163, 816 P.2d 1268. Notice of the public hearing where the condemnation was discussed *595 was given to local newspapers but the notice did not include notice of the preliminary agenda of the meeting as required by statute. Id. Thus readers had no reason to expect that any condemnation would be discussed. Id. at 162, 816 P.2d 1268. The subsequent condemnation was challenged on the basis of faulty notice. Id. at 163, 816 P.2d 1268. The court agreed that the notice was substantially faulty and vacated the decree of public necessity. Id. at 169, 816 P.2d 1268.
¶ 19 In Northwest Fur Breeders, the primary question for review was whether the statute requiring notice of the preliminary agenda for the legislative body applied to port districts. Id. at 164, 816 P.2d 1268. Once the decision was made that the statute applied, it was clear that the statute had been violated. See RCW 35.22.288 ("[E]very city shall establish a procedure for notifying the public of ... the preliminary agenda for the forthcoming council meeting." (emphasis added)). Northwest Fur Breeders provides us little help in deciding whether notice of a public meeting published on a web page is an appropriate exercise of the discretion vested by statute. The Court of Appeals specifically noted that
We do not hold that notice of the preliminary agenda for meetings at which condemnation will be considered must necessarily be published in a newspaper. Rather RCW 35.22.288 requires the Port to establish a procedure for notifying the public of the preliminary agenda. There may be effective methods of providing the required notice other than publication.
NW. Fur Breeders, 63 Wash.App. at 167 n. 5, 816 P.2d 1268. Here, the preliminary agenda was published; the question was whether Sound Transit correctly exercised the discretion vested in it by statute. Accordingly, we turn now to whether posting notice and a meeting agenda on the public agency's web site can satisfy the statute.

2. Web posting
¶ 20 There is very little case law on the subject of the sufficiency of web posting for notice requirements. Courts in several cases have rejected web posting as a method to apprise class members of a class action suit. See, e.g., Reab v. Elec. Arts, Inc., 214 F.R.D. 623, 631 (D.Colo.2002). However, in such instances the posting was not an exercise of legislative authority. Additionally, the California Court of Appeals held last year that statements on a web site "hardly could be more public." Wilbanks v. Wolk, 121 Cal. App.4th 883, 885, 17 Cal.Rptr.3d 497, 503 (2004); see also Reno v. Am. Civil Liberties Union, 521 U.S. 844, 870, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997) ("[The Web] provides relatively unlimited, low-cost capacity for communications of all kinds.").
¶ 21 Miller's argument that posting on a web site does not necessarily "furnish" notice to anyone is unfounded. Just as it is impossible to assure that anyone will look at a particular web site, it is equally impossible to assure that anyone will purchase, much less read, a newspaper. In addition, there is no way to assure that a newspaper will even publish a notice furnished by an agency because agencies are not required to buy advertising space. More important, however, is the fact that RCW 35.22.288 does not require an agency to use one of the listed methods, much less prohibit the use of the internet. The statute explicitly states that the methods "may include, but not be limited to" those specifically listed. RCW 35.22.288. Clearly, any other method that provides comparable notice to those listed would meet the statutory requirement. Miller has not shown that publication on the Sound Transit web site failed in any way to meet the standard set forth in the statute. While precedent on this subject is sparse, posting on a public web site is at least as likely to provide the community with notice as the specifically approved notice given to a newspaper, and this was the method Sound Transit had used for years.

3. Specificity
¶ 22 Miller also claims that the agenda posted by Sound Transit on its web site was not specific enough to put property owners on notice. We disagree.
¶ 23 The agenda stated in part that the Board of Directors would consider:
Resolution No. R2003-13  Authorizing the Executive Director to acquire, dispose, or *596 lease certain real property interests by negotiated purchase, by condemnation, (including settlement) condemnation litigation... to affected owners and tenants as necessary for the construction of the Lakewood and South Tacoma Commuter Rail Station, the new Lakewood Connector railroad line to be constructed from D Street to M Street in Tacoma ... and to execute all documents necessary to convey certain of those interests to the City of Tacoma[.]
Ex. 12. The agenda was sufficient to put the public on notice that a condemnation in the area would be considered. The statute requires only that the notice be descriptive enough for a reasonable person to be fairly apprised of what was to be discussed at the meeting and notice is generally deemed adequate absent a showing that it was misleading. Dep't of Natural Res. v. Marr, 54 Wash.App. 589, 596, 774 P.2d 1260 (1989) (citing Nisqually Delta Ass'n v. City of DuPont, 103 Wash.2d 720, 727, 696 P.2d 1222 (1985).) Miller cannot plausibly argue that a notice stating the intent to purchase property by condemnation would not have fairly apprised them of the meeting's purpose. Sound Transit provided all the notice that the statute requires and Miller does not argue that due process requires more.
¶ 24 We affirm the trial court and hold that Sound Transit's method of notifying the public meets the statutory standard.

B. Substantive Decision
¶ 25 Additionally, Miller challenges the substantive decision that the condemnation was necessary.[4] The trial court found that Miller had not substantiated any of their challenges by a preponderance of the evidence.
¶ 26 As stated previously, whether the condemnation is necessary is a legislative question. Hemenway, 73 Wash.2d at 139, 437 P.2d 171; State ex rel. Hunter v. Superior Court for Snohomish County, 34 Wash.2d 214, 218, 208 P.2d 866 (1949). A legislative body's determination of necessity is conclusive unless there is proof of actual fraud or arbitrary and capricious conduct amounting to constructive fraud or the government fails to abide by the clear dictates of the law.[5]Hemenway, 73 Wash.2d at 139, 437 P.2d 171. When reasonable minds can differ, courts will not disturb the legislative body's decision that necessity exists so long as it was reached "honestly, fairly, and upon due consideration" of the facts and circumstances. Welcker, 65 Wash.2d at 684, 399 P.2d 330. The decision may be unwise, but it is still a decision for the legislative body to *597 make, not this court. Miller, 61 Wash.2d at 391, 378 P.2d 464. Even if the decision was partially motivated by improper considerations, it will not be vacated so long as "the proposed condemnation demonstrates a genuine need and ... the condemnor in fact intends to use the property for the avowed purpose." In re Petition of Port of Grays Harbor, 30 Wash.App. 855, 864, 638 P.2d 633 (1982) (citing State v. Hutch, 30 Wash.App. 28, 631 P.2d 1014 (1981)).
¶ 27 Miller suggests that this court created a nine-part test in Deaconess Hospital v. Washington State Highway Commission, 66 Wash.2d 378, 403 P.2d 54 (1965), to determine whether the decision to condemn property was arbitrary and capricious.[6] But in 1998, 33 years after Deaconess, this court specifically noted that "[we have] not previously enumerated factors to consider when determining whether a public use is truly necessary." Evans, 136 Wash.2d at 823, 966 P.2d 1252. "[S]ome relevant considerations," however, "are the dollar contribution of the private party, the percentage of public versus private use, and whether the private use is occurring in an architectural surplus of usable space." Id.
¶ 28 Deaconess provided some different considerations but made clear that as long as the "administrative agency has acted honestly, with due deliberation, within the scope of and to carry out its statutory and constitutional functions, and been neither arbitrary, nor capricious, nor unreasonable, there is nothing left for the courts to review." Deaconess, 66 Wash.2d at 406, 403 P.2d 54. Again, this is rooted in our respect for the other branches of government. "A different conclusion would place the judiciary in the untenable position of substituting its judgment for that of the administrative agency contrary to a number of decisions." Id. This court has declined to create a definitive laundry list of considerations and this case provides no reason to depart from our tradition and precedent.
¶ 29 Instead, since the trial judge has already weighed the evidence supporting public necessity, this court will review the record to determine only whether the factual findings are supported by substantial evidence. Substantial evidence is viewed in the light most favorable to the respondent, and is evidence that would "persuade a fair-minded, rational person of the truth of the finding." State v. Hill, 123 Wash.2d 641, 644, 870 P.2d 313 (1994).
¶ 30 We turn now to the specific challenges.

1. Historical nature of the property
¶ 31 Miller argues that Sound Transit did not properly consider the historical nature of the property and, accordingly, its decision was arbitrary and capricious. At some point after March 2002, Miller learned that a house on the property had possible historical significance and that at least one other buyer was interested in the property. That buyer, however, was not interested in acquiring the property if it was going to be condemned. It appears that a house on the property was "built along the right-of-way by the railroad workers in the evening hours after work. They are referred to as twilight workers." 2 VRP (Nov. 1, 2004) at 121. The *598 Railcar Preservation Society attempted to interest Sound Transit in preserving the home as part of the transit center but, ultimately, Sound Transit declined to do so and the society turned to other projects.
¶ 32 The historical value of the property is questionable. After consideration, the Tacoma historic preservation office declined to nominate the house as a historic landmark. Similarly, the State Office of Archeology and Historic Preservation found the transit project had no adverse historical impacts. While it appears Sound Transit was not initially aware of the historical significance of the house when it was originally considering various sites, it was well aware of it by the time it had decided to condemn the property.
¶ 33 This court has already held that it is not arbitrary and capricious to select a site with a "substantial dwelling house" on the property, even when vacant tracts are nearby. Hunter, 34 Wash.2d at 219, 208 P.2d 866. In this case, the evidence of the historic property was considered by Sound Transit before it decided condemnation was necessary. This was affirmed by the trial court. Miller has not established arbitrary and capricious conduct upon these facts.

2. Problems with the other sites
¶ 34 Miller asserts that Sound Transit was mistaken about the potential environmental problems with the various sites.[7] At some point during the process, Sound Transit appears to have erroneously believed that the alternative sites were contaminated but that the Miller property was not. In fact, it appears that all the Tacoma sites were contaminated to some degree.
¶ 35 However, it is not the role of the court to take a second look at the various environmental considerations at issue. As long as Sound Transit considered the environmental impacts, it is not for the court to substitute its judgment in the absence of some demonstration of fraud or arbitrary and capricious conduct. See Brannan, 85 Wash.2d at 74-77, 530 P.2d 322. We note in passing that questions of public use and necessity are not subject to the State Environmental Policy Act, chapter 43.21C RCW. See generally Marino Prop. Co. v. Port of Seattle, 88 Wash.2d 822, 830-31, 567 P.2d 1125 (1977).

3. Better alternate locations
¶ 36 Miller contends that a nearby site would be better suited for the project and that condemnation is not necessary. But a particular condemnation is necessary as long as it appropriately facilitates a public use. Hemenway, 73 Wash.2d at 138, 437 P.2d 171. Put another way, when there is a reasonable connection between the public use and the actual property, this element is satisfied. It need not be the best or only way to accomplish a public goal. This court has explicitly held already that the "mere showing" that another location is just as reasonable does not make the selection arbitrary and capricious. Hunter, 34 Wash.2d at 219, 208 P.2d 866.
¶ 37 This broad approach is rooted not only in our deference to other branches of government, but also to the institutional competence of courts. We have already ruled that site selection is essentially a legislative question not a judicial one. Courts give especial deference to agency site selection decisions because courts "are not trained or equipped to pick the better route, much less design and engineer the project." Deaconess Hospital, 66 Wash.2d at 405, 403 P.2d 54; accord Brannan, 85 Wash.2d at 69, 530 *599 P.2d 322. Expert testimony from landscape architect Stephen Speidel, who believed another site was better suited for the transit station, is not a basis for reversing the legislative decision that condemnation was necessary.

4. Intimidation
¶ 38 Finally, Miller claims that one of the witnesses, William Eugene "Skip" Vaughn, was threatened by the chair of the Sound Transit Board. While this was raised to the trial court, no finding of fact or conclusion of law directly addresses it. The trial court impliedly found it uncompelling by finding that Sound Transit did not act in an arbitrary and capricious fashion.
¶ 39 Vaughn is chair of the South Tacoma Neighborhood Council. He had been involved in the siting of the South Tacoma rail station since at least 1998, and had attended at least three public meetings concerning it. After the site selection was made, Vaughn requested reconsideration. He preferred a different site. He testified that he met with Pierce County Executive John Ladenburg and Kevin Phelps, the city of Tacoma representative on the Sound Transit Board. Vaughn testified that "[t]hey indicated the decision had been made and would not discuss the reasons for it but indicated that if we made waves, we'd probably lose the station altogether." 2 VRP (Nov. 1, 2004) at 116. He also testified that he took their comments "[k]ind of as a threat to be quiet." Id. at 117, 530 P.2d 322.
¶ 40 We are unconvinced that Ladenburg's and Phelps' statements were threats.[8] At worst, Ladenburg and Phelps appeared to believe that without community support, there would be no transit station. There is no evidence on the record that Ladenburg or Phelps intended that the presence or absence of a transit station to adversely affect Vaughn.[9]
¶ 41 We find each of Miller's specific challenges to be without merit. Moreover, even if we agreed with one or more of Miller's contentions, we still might not disturb Sound Transit's finding of necessity because of the high level of deference we accord legislative bodies in making necessity determinations. Hunter, 34 Wash.2d at 218, 208 P.2d 866; Port of Grays Harbor, 30 Wash. App. at 864, 638 P.2d 633 (holding necessity determination will not be vacated as long as "the proposed condemnation demonstrates a genuine need and ... the condemnor in fact intends to use the property for the avowed purpose" (citing Hutch, 30 Wash.App. 28, 631 P.2d 1014)).

IV. CONCLUSION
¶ 42 We hold that Sound Transit properly exercised the discretion vested in it by law when it published its meeting agenda on its web site and that Miller has not shown that the public necessity determination was the product of arbitrary and capricious conduct or actual fraud. Accordingly, we affirm the trial court on all counts.[10]
C. JOHNSON, MADSEN, BRIDGE and OWENS, JJ., concur.
ALEXANDER, C.J. (dissenting).
¶ 43 The purpose of notice statutes is to fairly and sufficiently inform those who may be affected by government action of the nature and character of a proposed action so they may intelligently prepare for the public hearing on the action. Nisqually Delta Ass'n v. City of DuPont, 103 Wash.2d 720, 727, 696 P.2d 1222 (1985). In this case, Kenneth and Barbara Miller and their construction company, Miller Enterprises, Inc., *600 knew for years that they might be affected by Central Puget Sound Regional Transit Authority's (Sound Transit) rail project in Tacoma. In July 2001, the Millers even allowed the transit agency to survey and take soil samples from some of their land that was potentially on the project's path. That does not mean, however, that the Millers were "fairly and sufficiently" apprised that on June 26, 2003, the Sound Transit board would consider a resolution authorizing condemnation of their land. Because I believe that Sound Transit did not adequately inform affected parties before authorizing condemnation in this case, I dissent.
¶ 44 Prior notice that the condemnation resolution at issue would be considered was limited to a single item on the June 26, 2003, meeting agenda, posted only on the agency's website. That single agenda item referred to acquiring "certain real property interests" by negotiated purchase or condemnation, "as necessary for the construction of the Lakewood and South Tacoma Commuter Rail Stations." Ex. 12. And while the Miller property was described in Exhibit A to the proposed resolution, no specific locations were mentioned on the agenda posted electronically for public notice purposes. To say "Lakewood and South Tacoma" hardly narrows the possibilities. Therefore, at best, the meeting notice merely alerted the Internet-attentive people within the affected area to seek more details elsewhere. At worst, it utterly failed to apprise anyone lacking Internet access of the existence of the resolution.
¶ 45 "[A] proper hearing can be no greater protection for the public and the individual landowner than the opportunity afforded by the notice to take an informed part therein." Glaspey & Sons, Inc. v. Conrad, 83 Wash.2d 707, 713, 521 P.2d 1173 (1974). When interested parties are ill-informed of government proposals, "the public at large will be deprived of an `informed' resolution of problems that are the subject of the hearing." Id. at 713, 521 P.2d 1173. Here, Sound Transit does not point to any evidence in the record indicating that the Millers, or any other parties interested in the condemnation plan, were known to have access to the Internet. Yet the agency says it routinely relied solely on Internet postings to announce meeting agendas.[1] In doing so, it risked excluding a segment of the population from contributing to "an informed resolution" of station siting.
¶ 46 While I agree with the majority that the relevant statute, RCW 35.22.288, does not necessarily require notice to be published in a newspaper, I disagree that the Internet-only notice in this case met the intent of the statute. It is highly optimistic to expect a landowner's clicks of the computer mouse to lead, at the right time and on the right site, to a posted proposal bearing on his property interests. It may be true that relying on random turns of a newspaper's pages is just as unlikely to inform an affected citizen of a pending action. But the statute explicitly authorizes agencies to notify the public through newspapers, whereas the Internet is not mentioned. Furthermore, in my view newspapers are more accessible to a wider range of people due to their cost  one of the few things in life still available for pocket change. Accordingly, I am troubled that, despite the apparent absence of any prior e-mail correspondence with the Millers indicating they were "wired," so to speak, Sound Transit simply presumed they would receive notice posted exclusively on the Internet. I do not believe government should rest so easily in the assumption that this more expensive medium is universal. Due process demands that government err on the side of giving abundant notice when it seeks to take property. Therefore, I respectfully dissent.
CHAMBERS, J., concurs.
J.M. JOHNSON, J. (dissenting).
¶ 47 Appellants Kenneth and Barbara Miller had their property condemned by the Central Puget Sound Regulatory Transit Authority (Sound Transit) contrary to requirements *601 of public notice and without Sound Transit proving the public necessity of the condemnation. Sound Transit contented itself by solely posting the meeting agenda on its website rather than notifying the owner and public through publication in a local newspaper or through posting on the property or in other public places, as the statute envisions. The internet posting did not even specify which lots were considered for condemnation, but instead gave a general location of the property.
¶ 48 Sound Transit voted to condemn the Millers' property, but never made a showing that condemnation of Millers' property was a public necessity  either at the board meeting or at the hearing before the trial court. At every step of the condemnation process, Sound Transit asserted that agency determinations of public necessity are conclusive.
¶ 49 Washington Constitution article I, section 16 includes the express declaration that the question of a public use supporting a taking of private property by the government is a judicial question "without regard to any legislative assertion." This requirement is ignored (or explained away) by the majority, which instead suggests that "public use" is a legislative question entitled to deference. The majority's standard of review for public use contradicts the express constitutional mandate of article I, section 16.
¶ 50 Here, this error has the effect of allowing an agency to take a citizen's private property without adherence to proper notice procedures and to condemn without proper public consideration. The constitutionally limited eminent domain power is improperly expanded by the majority at the expense of the peoples' individual rights to own and use property and the public right to notice of governmental (proposed) action. I therefore dissent.

I. SCOPE OF CONDEMNATION AUTHORITY
¶ 51 The right to own and use private property is an inherent right of the people, strongly protected in the constitution of this state. So serious is the Washington Constitution's respect for the right to private property that it expressly provides for strictly limited exercise of eminent domain power by the legislature, closely examined by the judiciary in order to protect private property from governmental infringement:
No private property shall be taken or damaged for public or private use without just compensation having been first made .... Whenever an attempt is made to take private property for a use alleged to be public, the question whether the contemplated use be really public shall be a judicial question, and determined as such, without regard to any legislative assertion that the use is public ....
WASH. CONST. art. I, § 16.
¶ 52 The placement of this provision in article I, Declaration of Rights, further underscores the primacy of the right of the people to own private property. That placement, and the language quoted above, indicates an eminent domain power that is strictly limited in rightful application.[1]
¶ 53 Because of the inherent right of the people to own property, and the limited power of eminent domain, such power must be delegated by the legislature. Municipal corporations do not have an inherent power of eminent domain. Agencies may exercise such power only when expressly authorized to do so by the state legislature and in strict *602 accord with such delegation. See, e.g., State ex rel. Tacoma Sch. Dist. v. Stojack, 53 Wash.2d 55, 60, 330 P.2d 567 (1958); Teply v. Sumerlin, 46 Wash.2d 504, 507, 282 P.2d 827 (1955).
¶ 54 Statutes conferring condemnation power are in derogation of the people's right, State ex rel. King County v. Superior Court for King County, 33 Wash.2d 76, 82, 204 P.2d 514 (1949), and must be strictly construed, both as to the extent of the power and as to the manner of its exercise. See, e.g., Stojack, 53 Wash.2d at 60, 330 P.2d 567; State ex rel. Postal Tel.-Cable Co. v. Superior Court for Grant County, 64 Wash. 189, 193, 116 P. 855 (1911).[2]
¶ 55 To determine whether a use of the eminent domain power is permissible under our constitution, we employ a three-part test to judicially ascertain "(1) that the use is really public, (2) that the public interests require it, and (3) that the property appropriated is necessary for the purpose." In re City of Seattle (Westlake), 96 Wash.2d 616, 625, 638 P.2d 549 (1981) (citing King County v. Theilman, 59 Wash.2d 586, 593, 369 P.2d 503 (1962)). See also State ex rel. Wash. State Convention & Trade Ctr. v. Evans, 136 Wash.2d 811, 817, 966 P.2d 1252 (1998).
¶ 56 Because constitutional rights of a property owner are implicated, the burden of proof is on the condemning agency to demonstrate that the condemnation is for a public use and that (all) the taking is necessary for that public use. Convention Ctr., 136 Wash.2d at 822-23, 966 P.2d 1252; Theilman, 59 Wash.2d 586, 369 P.2d 503; State ex rel. Sternoff v. Superior Court for King County, 52 Wash.2d 282, 325 P.2d 300 (1958).[3]
¶ 57 Article I, section 16 of our state constitution requires a judicial "public use" inquiry. See State ex rel. Puget Sound Power & Light Co. v. Superior Court for Snohomish County, 133 Wash. 308, 311, 233 P. 651 (1925). The inquiries regarding public interest and necessity are judicial corollaries which provide enforcement of that constitutional mandate. Accordingly, article I, section 16 requires the court to determine whether an agency has adequately proved that condemnation satisfies the three-part test before private property may be taken.
¶ 58 These constitutional safeguards to the right to own property provided by article I, section 16 are undermined by the majority's assertion of an overly-deferential standard which accepts agency declarations as conclusive absent fraud or arbitrary and capricious conduct. Majority at 593. Our respect for coordinate branches of government should not nullify an explicit constitutional provision requiring the judiciary to provide a check upon taking of private property.
¶ 59 Furthermore, long-standing jurisprudence of this court mandates that legislative determinations do not preclude judicial examinations of the decision. See, e.g., Decker v. State, 188 Wash. 222, 227, 62 P.2d 35 (1936) ("[W]hether the use be `really public' is for the courts to determine, and in the determination of that question they will `look to the substance rather than the form, to the end rather than to the means.'" (quoting Puget Sound Power & Light Co., 133 Wash. at 312, 233 P. 651; State ex. rel. Andersen v. Superior Court for Lincoln County, 119 Wash. 406, 410, 205 P. 1051 (1922)) ("The legislature can declare in the first instance that the purpose is a public one, and it remains the duty of the court to disregard such assertion if the court finds it to be unfounded."); Healy Lumber Co. v. Morris, 33 Wash. 490, 501, 74 P. 681 (1903) ("Under such circumstances the case comes to the court without any presumption one way or the other on the subject of public use, but is to be tried by the court like any other question that is submitted to its discretion.").
*603 ¶ 60 Judicial abdication of such a constitutional mandate unjustifiably expands the power of the legislature and agencies in contravention of the clear terms of article I, section 16. Our constitution's use of the word "shall" is imperative and operates to create a duty on the courts. See, e.g., Crown Cascade, Inc. v. O'Neal, 100 Wash.2d 256, 668 P.2d 585 (1983). Only by ignoring that provision can the majority reach its standard of deference to the agency rather than judicial review. See WASH. CONST. art. I, § 29 ("The provisions of this Constitution are mandatory, unless by express words they are declared to be otherwise.").

II. FAILURE TO PROVIDE PROPER NOTICE
¶ 61 Sound Transit's exercise of eminent domain in this case was wrongful from the beginning due to its failure to provide proper notice in accordance with pertinent laws, and its own procedures.
¶ 62 Municipal corporations do not have an inherent power of eminent domain and may exercise such power only when expressly authorized by the legislature and in accordance with that authority. See, e.g., Stojack, 53 Wash.2d at 60, 330 P.2d 567. Statutes conferring such power "must be strictly construed, both as to the extent of the power and as to the manner of its exercise." Postal Tel.-Cable Co., 64 Wash. at 193, 116 P. 855.
¶ 63 RCW 81.112.080, which authorizes eminent domain by Sound Transit, declares that the exercise of such power shall be in the same manner as cities of the first class. Cities of the first class are required by RCW 35.22.288 to publish meaningful notices of meetings contemplating eminent domain. Port of Edmonds v. NW. Fur Breeders Coop., Inc., 63 Wash.App. 159, 816 P.2d 1268 (1991).
¶ 64 If the condemning governmental entity fails to give proper notice, the judgment of public use and necessity must be reversed and the eminent domain process must begin anew. Id. at 169, 816 P.2d 1268. See also Deaconess Hosp. v. Wash. State Highway Comm'n, 66 Wash.2d 378, 405, 403 P.2d 54 (1965) (failure to provide notice when required constitutes arbitrary and capricious conduct).
¶ 65 Procedural errors, such as lack of proper notice, are questions of law reviewed de novo. State v. Harris, 114 Wash.2d 419, 441, 789 P.2d 60 (1990). Because statutes delegating eminent domain power are in derogation of the people's rights, King County, 33 Wash.2d at 82, 204 P.2d 514, a condemning agency must establish that notice requirements were fulfilled in order to validly exercise the power and deprive a person of property.
¶ 66 Under the express terms of RCW 35.22.288:
[E]very city shall establish a procedure for notifying the public of upcoming hearings and the preliminary agenda for the forthcoming council meeting. Such procedure may include, but not be limited to, written notification to the city's official newspaper, publication of a notice in the official newspaper, posting of upcoming council meeting agendas, or such other processes as the city determines will satisfy the intent of this requirement.
¶ 67 Sound Transit passed Resolution No. 1-1 (Amended) adopting and amending rules and operating procedures for the Board. Ex. 14; 1 Verbatim Report of Proceedings (VRP) (Oct. 25, 2004) at 99. Section 16 of Resolution No. 1-1 (Amended) includes a requirement of public notice for upcoming meetings:
Whenever feasible, the Board Administrator shall furnish the Agenda for meetings of the Board and Committees to one or more local newspapers of general circulation in advance of such meetings.
Ex. 14, at 12. But Sound Transit did not do so here. Additionally, sections 4.A. and 4.B. require notification to local newspapers of general circulation and radio and television stations that have on file with the Board a request to be notified. Id. at 5. Here, Sound Transit merely placed an agenda on their website.
¶ 68 Thus, Sound Transit did not comply with either the statute or its own rule in providing notice to the public of the meeting. Mere placement of the agenda on the website *604 does not amount to "furnishing" notice to local newspapers as required by section 16 of Resolution No. 1-1 (Amended). Absent even the simplest communication concerning the agenda to one or more local newspapers of general circulation via fax, telephone, postcard, or even e-mail, such a posting does not constitute a "furnishing" of the agenda in any meaningful sense.
¶ 69 The majority ignores Sound Transit's requirements under section 16 of its own resolution, offering a footnote to affirm the trial court's conclusion that Sound Transit complied with its own internal rule. See Majority at 594-595 n. 3. The majority confuses the analysis by applying the text of RCW.35.22.288 only to the actions taken by Sound Transit.
¶ 70 Proper analysis requires consideration of compliance with the procedures that Sound Transit adopted pursuant to RCW 35.22.288. Agencies and municipal corporations must comply with internal procedures that are promulgated pursuant to statutory requirement. Compliance is a necessary implication of a statutory mandate. RCW 35.22.288 requires that procedures be adopted by Sound Transit and Sound Transit's statutorily-mandated procedures (i.e., section 16 of Resolution No. 1-1 (Amended)) require that Sound Transit furnish notice to newspapers. Sound Transit's adopted procedures provide the first standard for measuring the adequacy of Sound Transit's actions. We should hold that agencies and municipal corporations cannot ignore their own procedures, and that Sound Transit's failure to comply with its own procedures alone requires reversal of the trial court.[4]
¶ 71 Sound Transit further violated the express terms of the RCW 35.22.288 by placing the meeting agenda only on the website. RCW 35.22.288's enumeration of methods for notifying the public of upcoming hearings and the preliminary agenda for such meetings does not purport to be exhaustive. The statute limits the range of acceptable notice to processes that will satisfy the intent of the notification statute.
¶ 72 When the term "posting" is used in notice statutes, it always refers to posting of notice in a physical public place or affected area (e.g., on the property itself), but does not refer to posting on a website. RCW 35.13.140 (every ordinance must be published at least once in a newspaper and posted in at least "three public places"); RCW 35.27.300 (every ordinance must be published at least once in a newspaper and posted); RCW 43.21 C.080 (notice of action by governmental agency must be published in a newspaper, mailed, and posted at the project site).
¶ 73 Although website posting of the agendas of meetings may help satisfy notice requirements if combined with other methods of communication, this new technology and its low level of coverage among the public renders web posting insufficient to alone meet the requirements of RCW 35.22.288.
¶ 74 This conclusion is bolstered by the importance of the property rights that are implicated. Nor is the notice burden on an agency particularly onerous since there are simple, cost-effective, and commonly-accepted processes to notify the public. Contrary to one Sound Transit employee's testimony that it was considered "unseemly" by the agency to notify property owners individually, majority at 592; 1 VRP (Oct. 25, 2004) at 31, all Washington cities use the same statutory authority and have successfully used appropriate methods of notice for years.
¶ 75 As the majority notes, there is little case law considering the sufficiency of web posting for notice requirements. Majority at 595. Indeed, there is none upholding notice solely through web posting. One federal court has specifically rejected electronic means and internet notice alone as sufficient to notify a class of plaintiffs for a class action lawsuit. See Reab v. Elec. Arts, Inc., 214 F.R.D. 623, 631 (D.Colo.2002). The dearth of cases on web-notice can be attributed to the internet's status as a new and emerging technology *605 which large segments of our population have not yet accessed. No case, until this majority, has held web posting notice sufficient.
¶ 76 It is also worthy of note that although RCW 35.22.288's enumeration of methods for notification is not exhaustive, the legislature did not say web posting gives sufficient notice. I would not rewrite the statute, but would hold that website posting alone does not satisfy RCW 35.22.288 (or other notice requirements in statute).
¶ 77 Additionally, the actual notice provided by Sound Transit in this case was inadequate under RCW 35.22.288. The actual property was not identified in the agenda, so that neither the Millers nor the public would know this property was to be taken.
¶ 78 As stated above, statutes conferring eminent domain power "must be strictly construed, both as to the extent of the power and as to the manner of its exercise." Postal Tel.-Cable Co., 64 Wash. at 193, 116 P. 855. Because such statutes are in derogation of a constitutional right, King County, 33 Wash.2d at 82, 204 P.2d 514, effective notice must require that the agenda fairly apprise a reasonable person of the actual land under consideration for condemnation.
¶ 79 The notice statute's purpose is to fairly and sufficiently apprise those who may be affected of the nature and character of the action so that they may intelligently prepare for the hearing. Barrie v. Kitsap County, 84 Wash.2d 579, 585, 527 P.2d 1377 (1974); Nisqually Delta Ass'n v. City of DuPont, 103 Wash.2d 720, 727, 696 P.2d 1222 (1985).
¶ 80 Sound Transit, like other agencies, is required to have public meetings to assure public input in decision making. See RCW 42.30.010-.920.[5] Public notice that insufficiently apprises those who may be affected undermines the public confidence and trust that is placed into those legislative bodies and their decision-making abilities.[6]
¶ 81 Here, the agenda posted on the Sound Transit website contains a general description that Sound Transit would be considering condemning property for the South Tacoma Commuter Rail Station.[7] This did not sufficiently apprise the Millers or the public which actual property constituted the agenda item. Identification of the property could be accomplished through a listing by street address, by owner name, or by parcel number. I disagree with the majority in the conclusion that "notice that a condemnation in the area would be considered," Majority at 596, satisfies the applicable requirements. Notice of condemnation "in the area" is simply inadequate. Because of the protection our constitution gives to the right to private property and the limited nature of eminent domain, I would hold that the statute requires specific identification of the property to be condemned.

III. UNSUBSTANTIATED PUBLIC USE DETERMINATION
¶ 82 Sound Transit's exercise of eminent domain in this case was also wrongful due to *606 its failure to prove public necessity for the taking in accordance with applicable constitutional standards.
¶ 83 Article I, section 16's mandate is that public use be a judicial determination, and that statutes conferring such power must be construed strictly. Judicial inquiry into public use requires an inquiry into public necessity as a judicial corollary to provide enforcement of the constitutional mandate. As this court has previously maintained:
"[p]ublic use" and "necessity" cannot be separated with scalpellic precision, for the first is sufficiently broad to include an element of the latter. Can it be said that a "contemplated use" that does not include an element of "necessity" meets the constitutional mandated that it "be really public?" We think not.
¶ 84 Theilman, 59 Wash.2d at 594, 369 P.2d 503.
¶ 85 I reject the majority's conclusion that great deference be given to agency declarations of necessity. This would make agencies nearly immune from judicial review of public use. Although declarations of public use and necessity are properly legislative declarations in the first instance, our overriding constitutional duty requires independent judicial determinations in the final instance.
¶ 86 The court should require condemning agencies to make an objective, affirmative showing that the declaration of public use is based upon substantial evidence. See State v. Burch, 7 Wash.App. 657, 660, 501 P.2d 1239 (1972). The trial court must make findings that support the legal conclusion as to the necessity of the taking. See City of Des Moines v. Hemenway, 73 Wash.2d 130, 140-41, 437 P.2d 171 (1968). The condemning agency must establish that the declaration was made "honestly, fairly, and upon due consideration" of the facts and circumstances. City of Tacoma v. Welcker, 65 Wash.2d 677, 684, 399 P.2d 330 (1965).
¶ 87 Judicial review of public necessity must also recognize our case law that an agency declaration will not be upheld where it is arbitrary or capricious, or through abuse of discretion, violation of law, improper motives, or collusion. Stojack, 53 Wash.2d at 64, 330 P.2d 567. Declarations based upon fraud or constructive fraud will not be upheld. "To establish constructive fraud petitioners must show willful and unreasoned action without consideration and regard for facts or circumstances." In re Port of Seattle, 80 Wash.2d 392, 398, 495 P.2d 327 (1972); cf. Port of Olympia v. Deschutes Animal Clinic, Inc., 19 Wash.App. 317, 321, 576 P.2d 899 (1978) ("[W]e believe that the term constructive fraud is misleading in this context. Our courts, in actuality, review the declaration [of necessity] under the arbitrary and capricious standard, and we see no merit in applying a different label to that well-known test.").
¶ 88 Particularly relevant here is this court's language in Postal Telegraph-Cable Co., 64 Wash. at 195, 116 P. 855:
It is sufficient to make a strong prima facie case, but when convincing evidence is adduced by the owner that the land sought is not reasonably necessary, and that a slight change of location to other of his land will equally meet the necessity of the taker and be of much less damage to the owner, then it is incumbent upon the taker to rebut such evidence, since the refusal to make such change, if unexplained would amount to oppression and be an abuse of the power.
¶ 89 Courts reviewing public necessity declarations should also find guidance from this court's decision in Deaconess, 66 Wash.2d at 405-06, 403 P.2d 54, wherein we delineated several factors that are important for consideration:
By what tests should the court gauge administrative decisions? Here are the principal standards: Did the agency proceed in accordance with and pursuant to constitutional and statutory powers? Were the agency's motives honest and intended to benefit the public? Were they honestly arrived at  that is, free from influence of fraud and deceit? Were they free of any purpose to oppress or injure  even though injury and damage to some may be inherent in accomplishing the particular public benefit? Did the administrative agency give notice, where notice is *607 due, and hear evidence where hearings are indicated? Did the agency make its decision on facts and evidence? Were its actions in the last analysis rational, that is, based upon a reasonable choice supported by facts and evidence? If the answers to all of these queries are in the affirmative, then the decision of an administrator, unless placed under complete judicial review by law, cannot be held arbitrary, capricious, unreasonable or oppressive by the courts.
¶ 90 Here the majority erroneously confirms that Sound Transit's public necessity determination was correct. Based upon this record, however, Sound Transit did not demonstrate that its declaration was made "honestly, fairly and upon due consideration" of the facts and circumstances. See Welcker, 65 Wash.2d at 684, 399 P.2d 330.
¶ 91 First, Sound Transit's determination that condemning Miller's property constituted a public necessity was based upon an erroneous factual assertion that there were contamination problems with other sites. As the majority acknowledges, "At some point during the process, Sound Transit appears to have erroneously believed that the alternative sites were contaminated but that the Miller property was not." Majority at 598. Indeed, the trial court stated in its findings that Sound Transit represented at public meetings that Superfund problems inhibited alternative locations, but that such representations were not true. Clerk's Papers (CP) at 249 (Findings of Fact 19).
¶ 92 The record here requires us to conclude that alleged Superfund problems were wrongly relied upon by Sound Transit in making its determination. Only by adopting a rubber-stamp standard of review at odds with article I, section 16 and relevant case law can the majority look the other way.[8] To rely upon clearly erroneous factual information of such magnitude amounts to arbitrary or capricious conduct. See Welcker, 65 Wash.2d at 684, 399 P.2d 330 ("Arbitrary and capricious conduct is willful and unreasoning action, without consideration and regard for facts or circumstances.").
¶ 93 Additionally (and more fundamentally), neither Sound Transit Resolution No. R2003-13 nor Sound Transit's petition filed with the trial court contains particularized facts supporting a finding that taking Miller's property was a public necessity. The trial court hearing should have required Sound Transit to make a showing of substantial evidence in support of its public necessity declaration. Sound Transit has instead relied consistently upon the proposition that agency conclusions are conclusive. The constitutional mandate of article I, section 16 and our case law do not countenance rubber-stamp review by the judiciary of challenged public necessity declarations without a showing of evidence in support.
¶ 94 Consistent with this failure to prove facts supporting a finding that Miller's property is a public necessity, Sound Transit also failed to offer evidence rebutting Miller's evidence establishing the alternative site. Several cases have addressed a condemning agency's failure to properly consider alternatives. See, e.g., State ex rel. Lange v. Superior Court for King County, 61 Wash.2d 153, 377 P.2d 425 (1963); Wagle v. Williamson, 51 Wash.App. 312, 315-16, 754 P.2d 684 (1988); State v. Burch, 7 Wash.App. 657, 501 P.2d 1239 (1972); State Parks & Recreation Comm'n v. Schluneger, 3 Wash.App. 536, 475 P.2d 916 (1970). In these cases, alternatives were proffered by the property owner, but the condemning agency rebutted the testimony. Sound Transit's failure to offer rebutting evidence here contrasts sharply.
¶ 95 Sound Transit's errors of commission and omission are reflected in the trial court's conclusion that: "[Sound Transit] may have negligently omitted and missed some facts and evidence which ideally should have been considered, and if considered could have reasonably led to a different result." CP at 252 (Conclusion of Law 12). Nonetheless, the trial court concluded that such "error" was not fatal. Id. The trial court's *608 conclusion is inconsistent with the relevant legal standard and I would reverse. Deference of the courts to agency decisions which are procedurally flawed and based on facts known to be false diminishes public confidence in government and in the courts.

IV. CONCLUSION
¶ 96 In this case, "posting" on the website did not necessarily furnish notice either to the owner or to the public. By upholding Sound Transit's taking of private property through a process admittedly lacking proper notice and based upon erroneous factual information, the majority utilizes a standard of review that is contrary to our constitution.
¶ 97 Article I, section 16's express declaration that the taking of private property for public use is a judicial question "without regard to any legislative assertion," is undermined by the majority's decision. The right of owners  and the public  to full and fair consideration before private property is taken is eroded.
¶ 98 I dissent.
SANDERS, J., concurs.
CHAMBERS, J., concurs in result only.
NOTES
[1] It appears that the property valuation stage of the condemnation proceeding has been stayed awaiting this court's decision on whether Sound Transit has established public necessity for the condemnation.
[2] Nor would such a challenge to public use likely prevail. The dissent spends several pages arguing that the determination of public "use" is a judicial inquiry requiring no deference to the agency seeking condemnation. Dissent, J.M. Johnson, J., at 602-603. Not only do we disagree with the dissent's characterization of the court's role on this question, we note that it is not at issue here. First, while the determination of public use is for the courts, this court has explicitly stated that it will show great deference to legislative determinations. Hemenway, 73 Wash.2d at 139, 437 P.2d 171. Moreover, the condemnation of private property for public transportation is within the state's eminent domain power and almost categorically a public use. State ex rel. Devonshire v. Superior Court for King County, 70 Wash.2d 630, 636-37, 424 P.2d 913 (1967) (condemnation of private property for 1962 Exposition Monorail a public use (citing State ex rel. McIntosh v. Superior Court for Pacific County, 56 Wash. 214, 105 P. 637 (1909))). We also note that the dissent continues to conflate the terms "use" and "necessity" as it did in In re Petition of Seattle Popular Monorail Authority, 155 Wash.2d 612, 635 n. 18, 121 P.3d 1166 (2005). Dissent, J.M. Johnson, J., at 605-606. In the section entitled "Unsubstantiated Public Use Determination," the dissent uses the terms "use" and "necessity" interchangeably throughout the section, claiming that both are judicial determinations. Id. Second, although Miller originally challenged whether the project was for a public use, the trial court made a specific finding that Miller did not contest the determination of public use at trial and Miller did not assign error to the court's finding on appeal. Clerk's Papers (CP) at 251 (finding of fact no. 27).
[3] The dissent takes us to task for ignoring the notice requirements of Sound Transit's internal procedures in our analysis. Dissent, J.M. Johnson, J., at 603. However, the dissent does not cite any authority to support a claim that the internal procedures govern our analysis. We look to the statutory requirements to determine the adequacy of notice for condemnation. Regardless, the trial court found that Sound Transit complied with its own internal rule regarding notice of public meetings. The court determined that Sound Transit's method of posting notice on its web site was sufficient to furnish notice to the local newspapers. VRP (Nov. 19, 2004) at 12 ("There was nothing that I heard other than the custom for years that this was generally accepted in the community and, for all I knew, generally accepted by the newspapers as well.... I think that the ultimate conclusion is that it was an appropriate method of service to the newspapers."). Even if we were to analyze the notice provided by Sound Transit under its internal procedures, we would still find the notice to be sufficient. Sound Transit's internal procedures merely require the agenda to be furnished to one or more local newspapers of general circulation whenever feasible. Ex. 14 at 12 (emphasis added).
[4] As noted above, we do not review the question of whether the condemnation was for a public use because Miller conceded the point at trial. Our analysis addresses only the question of whether it was necessary to condemn this particular property.
[5] The dissent makes several claims regarding the trial court's review of the evidence, all of which misconstrue our case law regarding the court's role in assessing necessity. First, the dissent claims that the resolution and petition did not contain "particularized facts" about public necessity. Dissent, J.M. Johnson, J., at 605. However, at no point do either RCW 35.22.288 or RCW 8.12.060 require the resolution or petition to contain the level of detail suggested by the dissent.

Second, the dissent argues that the trial court did not require Sound Transit to make a show of substantial evidence to support its public necessity determination. Id. We reiterate that the necessity determination is deemed conclusive absent a showing by the property owner of actual fraud or arbitrary and capricious conduct amounting to constructive fraud; something Miller did not show. Seattle Popular Monorail, 155 Wash.2d at 629, 121 P.3d 1166; Hemenway, 73 Wash.2d at 139, 437 P.2d 171. However, even if this were not so, Sound Transit provided extensive evidence of the reasons for its determination. The Millers simply do not agree with those reasons. The fact that another choice could have been made does not tip the balance to the property owner in a review of necessity.
Third, the dissent claims that Sound Transit failed to provide rebuttal evidence to counter evidence presented by Miller. Dissent, J.M. Johnson, J., at 607. Again, based on the test we have outlined above, an agency is not required to rebut a property owner's evidence where the parties merely disagree on the chosen site. It the property owner has not shown actual fraud or arbitrary and capricious conduct by the agency, a court will generally let the agency's choice stand. Welcker 65 Wash.2d at 684-85, 399 P.2d 330. Even if such evidence were required, however, the record indicates that Sound Transit presented voluminous evidence supporting its site choice; the trial court was not obliged to require more.
[6] Miller refers to the following passage for support:

By what tests should the court gauge administrative decisions? Here are the principal standards: Did the agency proceed in accordance with and pursuant to constitutional and statutory powers? Were the agency's motives honest and intended to benefit the public? Were they honestly arrived at  that is, free from influence of fraud and deceit? Were they free of any purpose to oppress or injure  even though injury and damage to some may be inherent in accomplishing the particular public benefit? Did the administrative agency give notice, where notice is due, and hear evidence where hearings are indicated? Did the agency make its decision on facts and evidence? Were its actions in the last analysis rational, that is, based upon a reasonable choice supported by facts and evidence? If the answers to all of these queries are in the affirmative, then the decision of an administrator, unless placed under complete judicial review by law, cannot be held arbitrary, capricious, unreasonable or oppressive by the courts. That the courts may have reached a decision, made a choice or a conclusion different from that of the administrative agency, or taken wiser or more sensible action, does not empower them to do so.
Deaconess, 66 Wash.2d at 405-06, 403 P.2d 54.
[7] The dissent also asserts that Sound Transit made false representations about environmental problems related to the properties under consideration. Dissent, J.M. Johnson, J., at 607. It appears, though, that all of the properties had some environmental problems and Sound Transit simply failed to comment about the environmental issues on the Miller property. CP at 249 (finding of fact no. 19). The dissent claims that Sound Transit relied on "clearly erroneous factual findings" in making its determination and that this constituted arbitrary and capricious conduct. Dissent, J.M. Johnson, J., at 607. We disagree. It is far from clear to what extent Sound Transit relied on this information in making its determination. In addition, the trial court correctly considered the possibility that this and other facts might have affected the outcome and ultimately concluded that Sound Transit's determination was not unreasonable. CP at 252 (conclusion of law no. 12).
[8] Black's Law Dictionary defines "threat" as "[a] communicated intent to inflict harm or loss on another or on another's property, esp[ecially] one that might diminish a person's freedom to act voluntarily or with lawful consent." BLACK'S LAW DICTIONARY 1519 (8th ed.2004).
[9] Additionally, Miller alleges that a neighbor was told he could not get building permits while his property was being considered for condemnation. This does not appear to be relevant.
[10] Sound Transit also moves for sanctions for filing a frivolous appeal. RAP 18.9(a). We deny this motion, as there was a tenable issue of whether web posting is sufficient to meet notice requirements. Miller also moves for attorney fees under RCW 8.25.075. Given our disposition, we deny Miller's motion.
[1] I take little comfort in the agency's suggestion that a newspaper reporter might peruse the agency's website and independently inform the non-Internet-using public of meeting plans. Such a passive approach is inconsistent with the RCW 35.22.288 requirement for "notifying the public."
[1] See Healy Lumber Co. v. Morris, 33 Wash. 490, 505, 74 P. 681 (1903):

It was no doubt for the purpose of preventing enthusiastic legislation, practically destroying this limitation [on the exercise of eminent domain], that the question of public use was especially submitted to the courts, who are, and should be, ever watchful in maintaining inviolate the constitutional rights of the citizen.
See also James M. Dolliver, Condemnation, Credit and Corporations in Washington: 100 Years of Judicial Decisions  Have the Framers' Views Been Followed?, 12 U. Puget Sound L.Rev. 163, 175-76 (1989) ("The judicial determination clause in the Washington Constitution is a clause currently existing in only four other states [Arizona, Colorado, Mississippi and Missouri]"). "[T]he clear language of the provision, with its difference from most other constitutions and early cases, shows that the constitutional framers sought to place a limit on the legislature by assigning the judiciary to determine the character of proposed public uses." Id. (Footnotes omitted.)
[2] All delegations of state authority are to be construed strictly, and this is "`especially true with respect to the power of eminent domain, which is more harsh and peremptory in its exercise and operation than any other.'" State ex. rel. Chesterley v. Superior Court for Yakima County, 19 Wash.2d 791, 800, 144 P.2d 916 (1944) (internal cite omitted).
[3] The constitutional nature of the right of citizens to private property contradicts the majority's assertion that "[a]s the challenger, Miller bears the burden of proof that the notice was defective." Majority at 594.
[4] The majority, however, contends that we should ignore Sound Transit's compliance or non-compliance with its own adopted standards. Majority at 594-95 n. 3. The majority's contention is misguided. Rightful exercise of judicial review under article I section 16 and the rule of law require that we hold Sound Transit's noncompliance with its own procedures as fatal.
[5] The Open Public Meetings Act of 1971 declares principles underlying public input and awareness of agency meetings:

The people of this state do not yield their sovereignty to the agencies which serve them. The people, in delegating authority, do not give their public servants the right to decide what is good for the people to know and what is not good for them to know. The people insist on remaining informed so that they may retain control over the instruments they have created.
RCW 42.30.010.
[6] The Open Public Meetings Act contains a notice provision similar to the one directly at issue here:

No governing body of a public agency shall adopt any ordinance, resolution, rule, regulation, order, or directive, except in a meeting open to the public and then only at a meeting, the date of which is fixed by law or rule, or at a meeting of which notice has been given according to the provisions of this chapter. Any action taken at meetings failing to comply with the provisions of this subsection shall be null and void.
RCW 42.30.060(1).
[7] The meeting agenda read:

Resolution No. R2003-13  Authorizing the Executive Director to acquire, dispose, or lease certain real property interests by negotiated purchase, by condemnation, (including settlement) condemnation litigation, or entering administrative settlements, and to pay eligible relocation and re-establishment benefits to affected owners and tenants as necessary for the construction of the Lakewood and South Tacoma Commuter Rail Stations....
Ex. 12.
[8] See majority at 598 ("[I]t is not the role of the court to take a second look at the various environmental considerations at issue. As long as Sound Transit considered the environmental impacts, it is not for the court to substitute its judgment in the absence of some demonstration of fraud or arbitrary and capricious conduct.").