
FILED
COURT OF APPEALS DIV I
STATE OF WASHINGTON

2018 DEC 17 AM 9: 41

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| CITY OF KIRKLAND, a municipal corporation, | ) ) | No. 77447-6-I |
| Respondent, | ) ) | DIVISION ONE |
| v. | ) ) | |
| RITE AID CORPORATION, a Delaware corporation; and THRIFTY PAYLESS, INC., a California corporation, | ) ) ) ) | |
| Appellants, | ) ) | |
| WAL PROPERTIES, LLC, a Florida limited liability company; TENTH CHELTENHAM PROPERTIES, INC., a Delaware Corporation; ALBERTSONS COMPANIES, INC., a Delaware corporation, successor in interest to ALBERSTON'S, INC., formerly a Delaware corporation; ALBERTSONS COMPANIES, LLC, a Delaware limited liability company; SAFEWAY INC., a Delaware corporation; and KING COUNTY, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | UNPUBLISHED OPINION |
| Defendants. | ) | FILED: December 17, 2018 |

SCHINDLER, J. — In May 2016, the city of Kirkland (City) passed an ordinance authorizing condemnation of property owned by Wal Properties LLC to construct and operate a fire station to serve the annexed areas of Juanita and Finn Hill. Lessee Rite

Aid Corporation and its wholly owned subsidiary Thrifty Payless Inc. (collectively, Rite Aid) appeal the superior court order adjudicating public use and necessity. We affirm.

FACTS

In 2011, voters approved annexation of the King County unincorporated areas of Finn Hill, Juanita, and Kingsgate. King County Fire District 41 had been responsible for fire and emergency medical services to Finn Hill, Juanita, and Kingsgate and had contracted with the Kirkland Fire Department to provide fire and emergency services.

Fire District 41 and the city of Kirkland had previously discussed the need to improve response times. Fire District 41 proposed consolidating Fire Station 25 on Juanita Drive NE and Fire Station 24 on 84th Avenue NE into one fire station to serve Finn Hill. In May 2011, before the effective date of the annexation, Fire District 41 entered into an "Interlocal Agreement" with the city. The city of Kirkland (City) agreed to provide fire and emergency services to the annexed areas, to "continue and take over certain District projects," and to assume responsibility for projects intended "to improve fire and emergency medical services" and "response times." Fire District 41 agreed to transfer funds and the fire station consolidation project to the City.

In 2012, the City considered the feasibility of consolidating Fire Station 24 and Fire Station 25 and the option to retain Fire Station 25 and build a new Fire Station 24, the "Organizational Evaluation, Future Planning, Feasibility of Cooperative Service Delivery and Organizational Strategic Plan."

In 2013, the City conducted a "Standard of Coverage and Deployment Plan Study" to analyze fire department resources and the ability to meet response time standards. Emergency Services Consulting International (ESCI) completed the

2

"Standard of Coverage and Deployment Plan" in 2014. ESCI recommended the City consider the consolidated "single station" option and the "dual station" option maintaining Fire Station 25 and building a new Fire Station 24 in the north Kirkland/ Juanita area.

In July 2014, TCA Architecture Planning Inc. (TCA) completed the "Finn Hill Fire Station Siting Analysis." The TCA report states the single station option "would reduce response times in most areas of Finn Hill but would increase response times in some other areas," while the dual station option to build a "new station within a specific response coverage area" would "reduce fire and emergency medical service response time in the Finn Hill and Juanita areas." Using "test fit" conceptual drawings of a basic firehouse in the "initial review," TCA considered several potential sites for the two options. TCA evaluated 22 different sites for the consolidated single station and the dual station options.

The City Council "supported the dual station option" maintaining Fire Station 25 and building a new Fire Station 24 "in order to provide better response times to more residents without losing any service to Finn Hill." In August 2014, the City Council "directed further study of the two added properties on NE 132nd Street and 100th Ave NE" and "asked staff to broaden the dual station analysis to other properties in the area."

On November 6, 2014, the "Safety Facilities Steering Team" issued a "North Kirkland Fire Station Siting Update" (Update). The Update identifies six potential sites for the dual station option in Finn Hill near the intersection of NE 132nd Street and 100th Avenue NE, including property leased by Rite Aid Corporation located at 9820 NE

132nd Street. The Update states that each of the six sites could support a "2 Story crew area, single story at apparatus bays, [and] 3 drive-through bays." The Update notes the fire station needs to be "30-40% larger" to meet safety recommendations and code requirements.

> In the years that have passed from when District first envisioned a new fire station, National Fire Protection Association (NFPA) recommendations and requirements, State Energy Code requirements, and the recommendations found within the City's recent Standard of Coverage and Deployment Plan bear out the fact that an 8,406 square foot building is most likely not adequate to provide the programmatic needs of a modern fire station. Current fire station requirements for functionality, disaster preparedness supply storage and other space requirement updates may result in a more practical station size up to 30-40% larger. . . .
>
> . . . .
>
> Staff and the City's consultant continue to work on the final programmatic station requirements and needs and will return to City Council at a future meeting to discuss those specific elements. . . .
>
> . . . .
>
> Once a final site is selected, a refined cost estimate for each of the programmatic elements can be produced. Staff will then return to the Council for a decision on which elements, if any, should be included in the final station design and then a final new station budget will be developed.

The Update concludes the Rite Aid and Juanita Community Church sites are the "most viable options" to provide "the greatest improvement in response time to the largest number of Kirkland residents."

At the November 18, 2014 City Council meeting, staff requested direction on the size of the new fire station and other "elements" such as "a fire training facility, one- or two-story building, three or four truck bays, future expansion area, [and] community meeting room."

On October 20, 2015, the City Council adopted Resolution R-5156 and Resolution R-5163. Resolution R-5156 is a clarification of the intent of the May 2011 Interlocal Agreement between the City and Fire District 41 and the decision to retain Fire Station 25 and build a new Fire Station 24. Resolution R-5163 adopts "a plan for improving fire/EMS[1] services and for new, renovated or enhanced fire stations throughout the City." R-5163 identifies "Immediate Actions" as renovating Fire Station 25 and "[p]urchas[ing] property for a new Station 24 (estimated cost of up to $2.5 million) near Juanita Elementary School."

The City considered three sites located near Juanita Elementary School to construct and operate Fire Station 24: (1) The Juanita Community Church property located at 10007 NE 132nd Street, (2) the Rite Aid property located at 9820 NE 132nd Street, and (3) four residential properties in a subdivision located at the northeast corner of NE 132nd Street and 100th Avenue NE. City staff contacted the Juanita Community Church. The church agreed to relocate but only if the City provided "sufficient resources to purchase a new property and construct a new church of the same or larger size." The City was "unable to reach an acceptable arrangement with the Juanita Community Church." The City unsuccessfully attempted to locate and contact the owner of the Rite Aid property. The owners of the four residential subdivision properties indicated a willingness to sell. TCA concluded, "[T]hree to four" of the residential properties "would need to be purchased to provide adequate space for a fire station."

In January 2016, the City Council passed Ordinance O-4512 authorizing condemnation of the residential properties for "construction and operation of Fire Station No. 24." The title report disclosed a covenant that restricts use of the properties to

---

[1] Emergency medical service.

5

residential purposes and "other provisions that are also inconsistent with the City's plans for a new Fire Station." In May, the City terminated the purchase and sale agreements for the residential properties.

In the meantime, the City had identified and contacted the owner of the Rite Aid property, Wal Properties LLC. Wal Properties "indicated an interest in selling the property" and was not opposed to "condemnation proceedings."

Between the annexation in 2011 and 2016, the City's population increased more than 73 percent from 48,787 residents to 84,680 residents. The increased growth and "an unprecedented surge in development activity" created the need for "comprehensive planning to accommodate future growth."

On May 17, 2016, the City Council passed Ordinance O-4519 authorizing condemnation of the Rite Aid property "for the purpose of construction and operation of Fire Station No. 24." Ordinance O-4519 states, in pertinent part:

> WHEREAS, prior to Annexation, the City entered into an Interlocal Agreement ("Interlocal") with King County Fire Protection District No. 41 ("District") in which the City agreed to continue and take over certain District projects intended to improve response times; and
>
> WHEREAS, on October 20, 2015, the City Council adopted Resolution No. 5156 in which it found that construction and operation of a new Fire Station No. 24 to replace the existing Fire Station No. 24 was consistent with the purpose and the intent of the Interlocal; and
>
> WHEREAS, the City previously identified a proposed site for Fire Station No. 24, conducted negotiations with the owners of the four properties that comprised the proposed site and authorized the City to acquire the four properties in eminent domain pursuant to Ordinance No. 4512; and
>
> WHEREAS, the City subsequently determined that development of the previous site as a fire station was not feasible; and

WHEREAS, the City has identified a new proposed site for Fire Station No. 24; . . .

. . . .

NOW, THEREFORE, the City Council of the City of Kirkland do ordain as follows:

Section 1.    The land and property rights within the City of Kirkland, King County, Washington, described in Exhibit A to this Ordinance and incorporated herein, which are necessary for the public purpose of construction and operation of a fire station, are hereby condemned, appropriated, and taken for such public purposes, subject to the making or paying of just compensation to the owners thereof in the manner provided by law.

Wal Properties owned two adjoining parcels at the intersection of 100th Avenue NE and NE 132nd Street. Albertsons LLC leased the two parcels. Rite Aid and its wholly owned subsidiary Thrifty Payless Inc. (collectively, Rite Aid) is the sublessee of the property identified in Ordinance O-4519 that is subject to condemnation. Seattle Goodwill Industries is the sublessee of the adjoining property owned by Wal Properties. The Goodwill property is not subject to condemnation.

Wal Properties agreed to sell the Rite Aid property to the City for the appraised amount of $3,070,000 but only if the City agreed to "acquire the property subject to the lease." The City decided to proceed with condemnation.

The City retained TCA to "assess and review" the Rite Aid site and "study the parcel for the feasibility" of using the property "for the development of Fire State 24 and a Parks Maintenance Center, and alternatively, for the development of Fire Station 24 and a Fire Training Center."

On December 21, the City filed an eminent domain petition to condemn the Rite Aid "property and property rights" owned by Wal Properties.

On January 30, 2017, TCA issued the draft "Combined Use Site Feasibility Study." The study concludes the Rite Aid property "is too limited to support the development of a collocated Fire Station 24 and Parks Maintenance Center project." But the study concludes, "Developing the Rite Aid site for Fire Station 24 and a Fire Training Center is feasible." The study states the Rite Aid property "has been studied for a Training Center with reuse of the Rite Aid building (Study 5) and developing a Training Center with demolition of the Rite Aid building (Study 6)." Because of the "several hundred thousand dollar" cost, the City decided to postpone a "final design" for Fire Station 24 pending an order adjudicating public use and necessity.

At Rite Aid's request, the City retained TCA to consider the feasibility of the combined use and "co-location on the site with a new, smaller Rite Aid store." On February 2, 2017, TCA issued a "Final" "Combined Use Site Feasibility Study 9820 NE 132nd ST Ride Aid Parcel," concluding co-location with the Rite Aid would mean a smaller fire station.

> [W]hile the final design process for the fire station has not yet begun, co-location with Rite Aid would invariably require a smaller footprint for the fire station than would be possible if the fire station occupied the full Rite Aid property. Co-location with Rite Aid would likely eliminate any opportunities to provide space for fire training, a community room, additional vehicle bays, or future expansion areas.

The City Council unanimously passed a "[m]otion to [s]et aside efforts to co-locate on the site with Rite Aid and continue condemnation proceedings."

In support of the public use and necessity condemnation petition, the City submitted the declaration of Kirkland City Manager Kurt Triplett and a number of reports, memorandum, and TCA feasibility studies.

8

In opposition to finding public use and necessity, Rite Aid argued condemnation was not "necessary solely for the stated use" or public purpose. Rite Aid asserted the fire station would fit on "less than half" of the property and the City "intends to use the majority of the land for a different (yet to be determined) purpose." Rite Aid argued because the property exceeds the size needed to site a fire station, the decision to condemn the property amounts to constructive fraud. Rite Aid also argued Seattle Goodwill Industries is an indispensable party.

In his declaration, City Manager Triplett concedes Fire Station 24 "would fit on less than the full Rite Aid property" but states the City Council "has determined to use the entire Rite Aid property for the Fire Station Project." Triplett states the final design "will be expanded well beyond the design of the basic 'test fit' " and could include "several other components . . . not necessarily limited to":

> (a) A fire training facility for Kirkland's fire department. Presently, City firefighters must travel to Bellevue or Shoreline to complete the vast majority of their required training. Fire Chief Joe Sanford has made quite clear that a training facility is a key component of his preferred fire station, and TCA Architecture and Planning has already determined that a fire training facility can be co-located with a new Fire Station 24 on the Rite Aid property;
> (b) Whether to construct three truck bays or four in order to house the fire trucks and other apparatus, and whether to plan for future construction of an additional bay or bays;
> (c) Whether to have a one-story or two-story firehouse. A one-story firehouse would occupy more land, but would shorten the time it takes for firefighters to put on their gear and get to the trucks, thereby reducing critical and potentially life-saving response times;
> (d) Whether to include a community meeting room for the public's use; and
> (e) Other related amenities recommended by the Fire Department or otherwise desired by the City Council. The final design will be approved by the City Council. Regardless of the City Council's final design decision, the City Council and I know that the entire Rite Aid property must be put to a public use.[2]

---

[2] Footnote omitted.

9

Following the public use and necessity hearing, the court entered "Amended Findings of Fact, Conclusions of Law, and Order Adjudicating Public Use and Necessity." The findings state, in pertinent part:

There is no evidence that the City Council engaged in actual fraud, constructive fraud, or arbitrary and capricious conduct in adopting Ordinance No. 0-4519. Rather, the City Council made a deliberate and considered decision to acquire the Take Property after years of community involvement and consideration of more than 20 alternative sites. While most if not all of the sites considered would also have been feasible for the Fire Station Project, the City Council selected the Take Property in the exercise of its reasonable judgment.

. . . .
. . . As recently as May 16, 2017, the Kirkland City Council has unanimously affirmed its earlier decision, as expressed in Ordinance No. 0-4519, to use the entire Take Property for the Fire Station Project.

The conclusions of law on public use and necessity state, in pertinent part:

1. The Fire Station Project is a public use.
2. The City Council's determination that the Take Property (the entire Rite Aid parcel) is necessary for the Fire Station Project is "deemed conclusive" on the Courts in the absence of actual fraud or such arbitrary and capricious conduct as would amount to constructive fraud. [City of Tacoma v. Welcker, 65 Wn.2d 677, 684, 399 P.2d 330 (1965).] The Take Property is accordingly necessary for the Fire Station Project.
3. There is no requirement that the entire Fire Station Project be fully designed and engineered prior to the adjudication of public use and necessity. To do so in "many cases [would] be impractical, and in others impossible." [State ex rel. Wash. Water Power Co. v. Superior Court for Grant County, 8 Wn.2d 122, 127-28, 111 P.2d 577 (1941).] The Fire Station Project is described with reasonable certainty on this record.
4. The Kirkland City Council may properly consider future growth within the City when selecting the site of the Fire Station Project.
5. The City of Kirkland is not required to choose the smallest parcel practicable for its Fire Station Project. The fact that a fire station could be built on a different parcel, or on only a portion of the Take Property, is not determinative.
6. The determination of public necessity is a legislative question, not a judicial question. Even though a court may disagree, the City Council's decision stands provided that the proposed condemnation demonstrates a genuine need and the City in fact intends to use the

property for the avowed purpose. The Fire Station Project satisfies that test.[3]

The court rejected the argument that Goodwill Industries is an indispensable party. The conclusions of law state, in pertinent part, "Goodwill Industries is not an indispensable party in this matter. Any property interests concerning the parcel adjacent to the Take Property survive this condemnation action, as the City has not sought in its petition to condemn such rights." Rite Aid filed an appeal.

## ANALYSIS

Rite Aid challenges the determination of public use and necessity and the order authorizing the City to condemn the Rite Aid property for the Fire Station 24 project. Rite Aid contends condemnation of the property violates the Washington State Constitution and substantial evidence does not support the finding of public use and necessity.[4]

In determining public use and necessity, a trial court must make three separate but interrelated findings: (1) Whether the proposed use is really public, (2) does the public interest require it, and (3) is the property to be acquired necessary for that purpose. In re Petition of the Seattle Popular Monorail Auth. to Acquire by Condemnation Certain Real Prop. for Pub. Use as Auth. by Resolution No. 04-16, 155 Wn.2d 612, 629, 121 P.3d 1166 (2005) (Monorail). The latter two findings address necessity. In re City of Seattle, 104 Wn.2d 621, 623, 707 P.2d 1348 (1985). Although

---

[3] Footnotes omitted.

[4] For the first time on appeal, Rite Aid contends the court erred in failing to hold an evidentiary hearing. We do not consider arguments raised for the first time on appeal. Mukilteo Ret. Apts., LLC v. Mukilteo Inv'rs LP, 176 Wn. App. 244, 258, 310 P.3d 814 (2013). Nonetheless, we note the record establishes Rite Aid did not request an evidentiary hearing. We also note an evidentiary hearing is not necessary "[i]f there are no relevant factual disputes or credibility issues and the record is sufficient to fully inform the court." City of Blaine v. Feldstein, 129 Wn. App. 73, 76, 117 P.3d 1169 (2005); RCW 8.12.090.

the terms overlap, a determination that an acquisition is for public use is not precisely the same as determining it is a public necessity. Monorail, 155 Wn.2d at 629.

Public Use

The question of whether the contemplated use is really a public use is a judicial determination that we review de novo. WASH. CONST. art. I, § 16 (amend. 9); Cent. Puget Sound Reg'l Transit Auth. v. WR-SRI 120th N. LLC, 191 Wn.2d 223, 243-44, 233, 422 P.3d 891 (2018). Article I, section 16, amendment 9 of the state constitution states, in pertinent part:

> Whenever an attempt is made to take private property for a use alleged to be public, the question whether the contemplated use be really public shall be a judicial question, and determined as such, without regard to any legislative assertion that the use is public.

Rite Aid argues the City did not meet its burden of showing condemnation of the property is "really public." WASH. CONST. art. I, § 16 (amend. 9). Rite Aid does not dispute a fire station is a public use. See State ex rel. Hunter v. Superior Court for Snohomish County, 34 Wn.2d 214, 208 P.2d 866 (1949). Rite Aid contends the City is condemning more property than necessary for the fire station without identifying the other uses. Rite Aid asserts Fire Station 24 will occupy only a portion of the land and the City has not identified use of the "excess land."

But it is well established that the type and extent of the property the City seeks to condemn is not a question of public use but rather a question of necessity.

In Monorail, the property owner argued the "decision to condemn a fee interest in the entire property should be analyzed under the first prong of the test for 'public use,' rather than under the third prong of the test for 'necessity.' " Monorail, 155 Wn.2d at 630. The Washington Supreme Court rejected the property owner's argument. The

12

court held that "determinations by the condemning authority as to the type and extent of property interest necessary to carry out the public purpose have historically been considered legislative questions and are thus analyzed under the third prong of the test." Monorail, 155 Wn.2d at 630; see also Pub. Util. Dist. No. 2 of Grant County v. N. Am. Foreign Trade Zone Indus., LLC, 159 Wn.2d 555, 575-76, 151 P.3d 176 (2007) (NAFTZI) (emphasizing that a claim that excess property has been taken is addressed under the necessity prong). In determining necessity, the City is entitled to consider not only present but future needs. Hunter, 34 Wn.2d at 216.

We hold the record establishes the City has identified other public uses of the property and the decision to condemn the Rite Aid property for Fire Station 24 is a public use.

Necessity Findings of Fact

Rite Aid challenges the court's findings on necessity. Rite Aid contends the City did not meet its burden of establishing necessity because the record shows the City does not need to condemn the entire Rite Aid property for Fire Station 24.

We review the factual findings supporting public necessity under a substantial evidence standard. WR-SRI 120th N., 191 Wn.2d at 245. Substantial evidence is viewed in the light most favorable to the respondent and is evidence that would persuade a fair-minded, rational person of the truth of the finding. WR-SRI 120th N., 191 Wn.2d at 245. Unchallenged findings are verities on appeal. Asarco, Inc. v. Dep't of Ecology, 145 Wn.2d 750, 764, 43 P.3d 471 (2002).

Rite Aid challenges the following findings of fact on necessity:

11. Rite Aid has produced evidence indicating that the Fire Station Project could be located on a parcel other than the Take Property, or on

13

only a portion of the Take Property. The City does not disagree, and the City Manager affirmatively testified that "[w]ithin reason, the City can design and construct a fire station of widely varying types and sizes to fit on parcels of similarly varied sizes." The City Manager's testimony concludes, however, that "[t]he City Council in this case simply chose to obtain a site that would accommodate a larger fire station."

. . . .

13. While the other sites considered by the City Council would also work for the Fire Station Project, the City Council instead selected the Take Property. The City Council's decision specifically included consideration of a Fire Station Project of a size sufficient to meet current needs as well as the needs generated by future growth. As ultimately designed and constructed, the City Council intends that the Fire Station Project will also include training facilities for Kirkland's firefighters, additional truck bays for fire-fighting apparatus, meeting rooms, and other fire station amenities for the public use. According to a report prepared in January 2017 by TCA Architecture and Planning, "Developing the Rite Aid site [Take Property] for Fire Station 24 and a Fire Training Center is feasible," either with or without the existing Rite Aid building.[5]

Rite Aid challenges the following conclusions of law on necessity:

3. There is no requirement that the entire Fire Station Project be fully designed and engineered prior to the adjudication of public use and necessity. To do so in "many cases [would] be impractical, and in others impossible." [Wash. Water Power, 8 Wn.2d at 127-28.] The Fire Station Project is described with reasonable certainty on this record.

. . . .

6. The determination of public necessity is a legislative question, not a judicial question. Even though a court may disagree, the City Council's decision stands provided that the proposed condemnation demonstrates a genuine need and the City in fact intends to use the property for the avowed purpose. The Fire Station Project satisfies that test.[6]

Rite Aid contends substantial evidence does not support condemnation of the property that is not necessary to construct and operate Fire Station 24. Rite Aid contends that only 25 percent of the Rite Aid property is necessary for a fire station and asserts the record shows the City Council did not identify other public uses.

---

[5] Most alterations in original; footnotes omitted.

[6] Footnotes omitted.

"[W]hether the condemnation is <u>necessary</u> is a legislative question." <u>Cent. Puget Sound Reg'l Transit Auth. v. Miller</u>, 156 Wn.2d 403, 417, 128 P.3d 588 (2006).[7] "A legislative determination of necessity is ' "conclusive in the absence of proof of actual fraud or arbitrary and capricious conduct, as would constitute constructive fraud." ' " <u>WR-SRI 120th N.</u>, 191 Wn.2d at 244 (quoting <u>NAFTZI</u>, 159 Wn.2d at 575-76) (quoting <u>Monorail</u>, 155 Wn.2d at 629)); <u>Miller</u>, 156 Wn.2d at 417.

"Arbitrary and capricious action has been defined as willful and unreasoning action, without consideration and regard for facts or circumstances." <u>Miller v. City of Tacoma</u>, 61 Wn.2d 374, 390, 378 P.2d 464 (1963). When reasonable minds can differ, courts will not disturb the legislative body's decision that necessity exists so long as it was reached "honestly, fairly, and upon due consideration" of the facts and circumstances. <u>Welcker</u>, 65 Wn.2d at 684-85.

Judicial review of the legislature's determination is deferential. <u>Miller</u>, 156 Wn.2d at 411-12.

> "[W]hen it comes to such discretionary details as the particular land chosen, the amount of land needed, or the kinds of legal interests in that land that are necessary for the project, many Washington decisions have said that the condemner's judgment on these matters will be overturned only if there is proof of actual fraud or such arbitrary and capricious conduct as would amount to constructive fraud."

<u>Miller</u>, 156 Wn.2d at 412[8] (quoting 17 WILLIAM B. STOEBUCK & JOHN W. WEAVER, WASHINGTON PRACTICE: REAL ESTATE: PROPERTY LAW § 9.28, at 636 (2d ed. 2004)).

In <u>WR-SRI 120th North</u>, the Washington Supreme Court reiterated that we "avoid questioning the condemning authority's determination 'as to the type and <u>extent</u> of property interest necessary to carry out the public purpose.' " <u>WR-SRI 120th N.</u>, 191

---

[7] Emphasis in original.
[8] Internal quotation marks omitted.

Wn.2d at 245[9] (quoting Monorail, 155 Wn.2d at 630). The court held that "necessity" in the eminent domain context "does not mean absolute necessity." WR-SRI 120th N., 191 Wn.2d at 245.

> "The word 'necessary,' when used in or in connection with eminent domain statutes, means reasonable necessity, under the circumstances of the particular case. It does not mean absolute, or indispensable, or immediate need, but rather its meaning is interwoven with the concept of public use and embraces the right of the public to expect and demand the service and facilities to be provided by a proposed acquisition or improvement. Reasonable necessity for use in a reasonable time is all that is required."

WR-SRI 120th N., 191 Wn.2d at 245 (quoting Welcker, 65 Wn.2d at 683-84).

Substantial evidence supports finding condemnation of the entire Rite Aid property is necessary. The undisputed record demonstrates a dramatic increase in population and the need to build a larger fire station for future growth and to meet emergency service response requirements for the annexed areas. When the City Council approved condemnation of the entire Rite Aid property to construct and operate Fire Station 24, the estimated population in 2016 was 84,680—a 73 percent increase from the population before annexation in 2011. Following annexation, the City was also "experiencing an unprecedented surge in development activity." The City's "Major Development Projects" report updated in February 2017 states the City is "reviewing and processing applications or pre-application submittals for more than 4,700 residential units and more than 1,700,000 square feet of commercial, office, and institutional projects." The significant growth in population and development "will continue to drive the need to increase fire and emergency medical services in order to serve the new residents and new development."

---

[9] Emphasis in original.

A 2014 update to the City Council estimated that the fire station would need to be "30-40% larger" to accommodate safety recommendations and meet "the programmatic needs of a modern fire station." "[P]rogrammatic building elements" include "a fire training facility, one- or two-story building, three or four truck bays, future expansion area, [and] community meeting room."

City Manager Triplett testified that the ultimate design "will be expanded well beyond the design of the basic 'test fit' " to accommodate a "one-story or two-story firehouse," the fire training facility, additional truck bays, and "[o]ther related amenities recommended by the Fire Department." The City is not required to fully design and engineer the fire station facility before a judicial finding of public use and necessity; to do so would, "in many cases, be impractical, and in others impossible." Wash. Water Power, 8 Wn.2d at 127-28. As the Washington Supreme Court held in Deaconess Hospital v. Washington State Highway Commission, 66 Wn.2d 378, 405, 403 P.2d 54 (1965):

> Once the purpose for which the lands are taken has been adjudged to be public, the kind and type of roadway, the route to be followed, the design and engineering details become the subject of administrative decision. . . .
> Although the courts may well determine from the evidence whether a project is for the public benefit, convenience or necessity, they are not trained or equipped to pick the better route, much less design and engineer the project. Thus, the rule that leaves these decisions to the administrative agencies is a sensible one consistent with the idea that the public's business be carried out with reasonable efficiency and dispatch by those possessing the superior talents to accomplish the public purposes.

Although the City has not prepared or adopted the "final design" of Fire Station 24 or the training facility, the record shows the City has "described with reasonable certainty" the general plan for the property. Wash. Water Power, 8 Wn.2d at 128. The February 2017 feasibility study includes a design that utilizes approximately one acre of

the Rite Aid property for Fire Station 24 and uses the remaining property for a fire training facility that includes a tower training area. The design utilizes 86 percent of the property. The unchallenged findings state, in pertinent part, "Due to the 'several hundred thousand dollar' cost of just the design alone (exclusive of construction costs), the final design for the Fire Station Project will not be completed until the Court has determined the City may acquire the Take Property."

In Hunter, the Washington Supreme Court upheld the determination of public use and necessity of 1.52 acres to accommodate a fire station, storage for fire equipment, and a training area and to anticipate future growth. Hunter, 34 Wn.2d at 216-18. Rite Aid argues Hunter is distinguishable because in that case, "[t]he commissioners concluded that the district should acquire sufficient land for a training area in addition to that necessary for the building." Hunter, 34 Wn.2d at 217. Here, the record shows the City Council unanimously decided to use the entire property for the public purpose of building Fire Station 24 with a training facility, additional truck bays, and a community center meeting room.

> [W]here property is taken . . . with the intention of using it for a certain purpose specified in the ordinance authorizing the taking, . . . the city, doubtless, has the authority to change said contemplated use to another and entirely different use, whensoever the needs and requirements of the city suggest.

Seattle Land & Improvement Co. v. City of Seattle, 37 Wash. 274, 277, 275, 79 P. 780 (1905) (city condemned property for park but built an in-town terminal station); see also Monorail, 155 Wn.2d at 634; Reichling v. Covington Lumber Co., 57 Wash. 225, 226-28, 106 P. 777 (1910) (city condemned property for water system but subsequently allowed construction of logging railroad over property).

18

Substantial evidence also supports the conclusion that the City Council did not engage in arbitrary or capricious conduct amounting to constructive fraud. The court found there was no evidence that the City Council engaged in actual fraud or arbitrary and capricious conduct amounting to constructive fraud. The court found:

> There is no evidence that the City Council engaged in actual fraud, constructive fraud, or arbitrary and capricious conduct in adopting Ordinance No. O-4519. Rather, the City Council made a deliberate and considered decision to acquire the Take Property after years of community involvement and consideration of more than 20 alternative sites. While most if not all of the sites considered would also have been feasible for the Fire Station Project, the City Council selected the Take Property in the exercise of its reasonable judgment.

Rite Aid claims there is evidence that the City might use the land for a private use. Rite Aid relies on an e-mail from a councilmember and notes from a February 2017 City Council retreat.

In January 2017, a City resident sent the following e-mail regarding Fire Station 24 to councilmember Toby Nixon:

> Location on NE 132nd st - It is soo wrong! We alr[e]ady have a fire station on NE 132nd. Are you trying to imitate Starbucks with a station on every corner?
>
> Using up a good location that can turn into a Juanita Village is atrocious - and poor planning.[10]

In response, councilmember Nixon described the City's plan to maintain Fire Station 25 at its current location, construct a new Fire Station 24 near 100th Ave NE and NE 132nd Street, and eventually relocate Fire Station 27 "farther east." Councilmember Nixon's response notes that "[t]he Rite Aid (rear part), Goodwill, service

---

10 Juanita Village is "a mixed-use development on the corner of Northeast 116th and 100th Avenue Northeast that is retail on the bottom and residential on top."

station, and bank sites, could be combined and redeveloped." The e-mail response states, in pertinent part:

> [A new station] would be positioned roughly in the middle between Station 25 and Station 27, and able to reach all portions of Kirkland in northeast Finn Hill and northwest Juanita within four minutes. . . . We've looked at many, many potential locations, and all have some challenges. The Rite Aid site currently being considered has the fewest challenges and the owner of the property is willing to sell at a reasonable price.
>
> So, to directly answer your question, No, we're not putting a fire station on every corner. . . .
>
> Putting a station on the Rite Aid site toward the front of the lot (closer to NE 132nd St) would not preclude other uses of the rear part of the Rite Aid site where the building is currently located. The Rite Aid (rear part), Goodwill, service station, and bank sites, could be combined and redeveloped as a mixed-use multi-story structure like Juanita Village.[11]

The "February 2017 Council Retreat" notes state, in pertinent part:

Fire Station Projects
- Consider a pedestrian overpass from fire station site to Juanita Elementary
- Involve City Council in how to use the remainder of the lot not needed for the station
- Include community meeting space at Station 24
- Identify the cost of alternate uses of Rite Aid site
- Don't take away retail use (sales tax generator) unless necessary.

Rite Aid contends the e-mail response and notes from the retreat show that the City is "interested" in alternative, private ways to use the Rite Aid property. Neither councilmember Nixon's speculation nor the notes from the council retreat indicate a final council determination. All of the councilmembers must make the final determination on use. City staff, including City Manager Triplett, meet with "the public safety committee . . . first, and then those committees make recommendations to the full Council." The record does not support Rite Aid's assertion that the City intends to use any portion of

---

[11] Emphasis in original.

the property for a private use. Further, Deputy City Manager Marilynne Beard testified the only "discussion of commercial use" was related to Rite Aid's request to consider co-location:

> There have been some discussions with Rite Aid about is there — there's been interest on Rite Aid's part to remain on the site somewhere, and to the — you know, we've listened and are, you know, looking at . . . is that even possible.
> But a multiuse site, other than Rite Aid, I'm not aware of.

Rite Aid also claims the decision to condemn the Rite Aid property was arbitrary and capricious because the City could have built Fire Station 24 on the residential subdivision properties. The record does not support Rite Aid's argument.

Site selection is not subject to judicial interference. WR-SRI 120th N., 191 Wn.2d at 245-46. " 'Courts give especial deference to agency site selection decisions because courts are not trained or equipped to pick the better route, much less design and engineer the project.' " WR-SRI 120th N., 191 Wn.2d at 246[12] (quoting Miller, 156 Wn.2d at 422)).

Rite Aid argues the City Council's conduct was arbitrary and capricious because the Rite Aid property costs more than the residential properties. Rite Aid's argument ignores the restrictive covenant that prevented the City from proceeding with consideration of the residential properties. Further, even considering cost "as a relevant factor," the record shows the estimated total cost of the residential properties is $12,124,128 and the total cost using the Rite Aid property is $11,814,305. Monorail, 155 Wn.2d at 635-36. No evidence shows the City made its selection in bad faith or the City Council "acted in an arbitrary or capricious manner." Hunter, 34 Wn.2d at 218-19. The record shows the City Council considered many properties and gave weight to

---

[12] Internal quotation marks omitted.

many factors, including the size and feasibility of building a larger facility, the costs of acquiring land, and the costs of the project as a whole.

The record also shows that before the City Council passed Ordinance O-4519, the City prepared a "Site Comparison" of the residential properties and the Rite Aid property. The Site Comparison states the Rite Aid property "provides additional area in back to conduct training" and has the "[m]ost flexibility for station design [and] parking." After five years of consideration and planning, the City chose a larger site to anticipate future needs and to accommodate a larger fire station, including additional truck bays and a training facility.

Substantial evidence supports the court's finding that the City Council made "a deliberate and considered decision to acquire the Take Property . . . . While most if not all of the sites considered would also have been feasible for the Fire Station Project, the City Council selected the Take Property in the exercise of its reasonable judgment."

We conclude that the findings support public necessity and that Rite Aid did not establish arbitrary and capricious conduct amounting to constructive fraud.[13]

Indispensable Party

Rite Aid contends the court erred by concluding Goodwill Industries is not an indispensable party to the condemnation under RCW 8.12.060.

RCW 8.12.050 requires a city to file a petition for condemnation in superior court identifying all owners with an interest in the property. RCW 8.12.060 provides:

> Such petition shall contain a copy of said ordinance, certified by the clerk under the corporate seal, a reasonably accurate description of the lots, parcels of land and property which will be taken or damaged, and the

---

[13] For the first time on appeal, Rite Aid argues that the City committed actual fraud on the court. Rite Aid did not argue the City Council committed actual fraud below. Rite Aid argued that the City Council's conduct was so arbitrary and capricious that it amounted to constructive fraud.

names of the owners and occupants thereof and of persons having any interest therein, so far as known, to the officer filing the petition or appearing from the records in the office of the county auditor.[14]

Wal Properties owns the 2.52-acre property that is subject to condemnation. Wal Properties also owns the adjacent property. Wal Properties leased both properties to Albertsons. Albertsons subleased the 2.52-acre property to Rite Aid and subleased the adjacent property to Goodwill Industries.

The court found, "There is no evidence that Goodwill Industries, the lessee of the adjacent separate parcel, has a property right in the Take Property," finding of fact 16. The court concluded, "Goodwill Industries is not an indispensable party in this matter." Albertsons filed a motion for reconsideration. Albertsons requested the court to delete finding of fact 16 and amend conclusion of law 7 to state:

> Goodwill Industries is not an indispensable party in this matter. Any property interests concerning the parcel adjacent to the Take Property survive this condemnation action, as the City has not sought in its petition to condemn such rights.

The City did not oppose the motion. The court granted the motion for reconsideration. The Amended Findings of Fact, Conclusions of Law, and Order Adjudicating Public Use and Necessity does not include former finding of fact 16 and adopts the language Albertsons proposed to conclusion of law 7.

Rite Aid contends Goodwill Industries is a party in interest under the sublease with Albertsons because Goodwill Industries has a right to use the "common areas."[15]

RCW 8.12.060 does not require joining the holder of a leasehold interest. City of Pullman v. Glover, 73 Wn.2d 592, 594-95, 439 P.2d 975 (1968). "An action against

---

[14] Emphasis added.

[15] For the first time on appeal, Rite Aid also contends Goodwill Industries is a party in interest because the condemnation will impact Goodwill Industries' proportionate share of common area expenses. The court does not consider arguments raised for the first time on appeal. RAP 2.5(a).

property being taken in condemnation, subject to an existing leasehold, may be maintained under RCW 8.12.060 without joining the holder of the leasehold interest." Glover, 73 Wn.2d at 594-95.

The case Rite Aid cites to argue Goodwill Industries is an indispensable party is inapposite. In Public Utility District No. 1 of Pend Oreille County v. Inland Power & Light Co., 64 Wn.2d 122, 123, 390 P.2d 690 (1964), the court addressed whether a state court has jurisdiction to "entertain an action of eminent domain against properties in which the United States has an interest." Because the United States was a "necessary and indispensable party to the eminent domain proceeding," the state court could only maintain the action if the United States consented to be sued. Pub. Util. Dist. No. 1, 64 Wn.2d at 124-26.

We conclude the court did not err by concluding Goodwill Industries is not an indispensable party in the petition.

We affirm the Amended Findings of Fact, Conclusions of Law, and Order Adjudicating Public Use and Necessity.

_____
Chevinelle, J

WE CONCUR:

_____          _____
Leach, J.                           Dwyer, J.